**William R. RUSSELL, III, Plaintiff,**

v.

**THE PAUL REVERE LIFE INSURANCE COMPANY, Defendant.**

**No. CIV A 96–474–GMS.**

United States District Court, D. Delaware.

June 8, 2001.

---

Phebe S. Young, The Bayard Firm, Wilmington, DE, for plaintiff.

Richard S. Cobb, Duane, Morris & Heckscher, LLP, Wilmington, DE, for defendant.

## MEMORANDUM OPINION

SLEET, District Judge.

### I. INTRODUCTION

Presently before the court are cross-motions for summary judgment on the issue of whether the plaintiff, William R. Russell, III ("Russell"), is entitled to long-term disability benefits under his former employer's disability benefit policies. Russell filed an action with this court pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking review of the denial of his claims for long-term disability benefits by the defendant, Paul Revere Life Insurance Company ("Paul Revere"). Russell alleges that Paul Revere arbitrarily and capriciously denied him long-term disability benefits and failed to provide him a full and fair review of his administrative claim in violation of certain procedural requirements under ERISA. Paul Revere argues that its findings were appropriate in light of the discretion it retains as the plan administrator to interpret the Individual and Group policies. Therefore, it contends that the decision to deny benefits was not arbitrary and capricious. Further, Paul Revere maintains that its decision not to release the claim file to Russell during his appeal was not a procedural violation and that, in any event, Russell suffered no harm therefrom. In the alternative, assuming a procedural violation, Paul Revere argues that Russell is not entitled to a substantive remedy.

For the reasons that follow, the court finds that Paul Revere's decision to deny benefits was not arbitrary and capricious. Further, the court finds that Paul Revere substantially complied with the requirements of ERISA § 1132(2), that no procedural violation occurred, and that neither a substantive, nor a procedural remedy is warranted. Therefore, the court denies Russell's cross-motion for summary judgment and grants Paul Revere's cross-motion for summary judgment.

### II. BACKGROUND

William Russell was employed as a Vice President and Real Estate Asset Manager with Corporate Property Investors ("CPI"), from March 1990 until he stopped working, on January 23, 1995, for reasons

associated with his claimed disability.[1] Russell's position with CPI entailed the management of several real estate assets and was primarily a "desk job," but one which required travel to various property sites. Russell asserts that his resignation from CPI was precipitated by chronic pain and fatigue which "rendered him unable to carry out the responsibilities and requirements of his job." (D.I.30). In February 1995, Russell filed for disability benefits with Paul Revere. Among his symptoms, Russell cited abdominal pain of an undiagnosed etiology and associated joint and muscle pain, fatigue, and nausea. (D.I. 30 at A–82). Lucinda Harris, M.D., and Frank Petito, M.D., Russell's attending physicians, confirmed Russell's description of his symptoms as noted in the supporting claim documentation. (D.I. 31 at A–8–9). As a result, Paul Revere preliminarily began providing Russell with disability benefits, subsequent to a 90–day limitation period, while it reviewed his long-term benefit claims.[2] On April 5, 1995, Russell submitted the bulk of his supporting documentation, including referral reports and examination results. (D.I. 31 at B–1–110). Russell supplemented his claims with additional information on April 19, 1995. (D.I. 31 at B–111–120).

On January 16, 1996, following review of Russell's claims and associated documentation, Paul Revere notified Russell of its decision to deny him long-term benefits under both the Individual and Group policies. In particular, Paul Revere indicated that its review determined that Russell did not continue to meet the definition of "total disability" as defined. (D.I. 32 at B–449–52). On April 11, 1996, Russell formally appealed Paul Revere's denial of long-term benefits and submitted additional documentation in support of his claims. Paul Revere subsequently undertook a review of Russell's claims on appeal. On June 20, 1996, Paul Revere, citing a lack of "objective medical evidence" demonstrating that Russell was precluded from performing the duties of his occupation, denied Russell's claim with respect to the Group Policy. (D.I. 32 at B–840–41). On June 28, 1996, Paul Revere, citing the same reasons, denied Russell's claim with respect to the Individual Policy. (D.I. 32 at B–842–23).[3]

## A. Russell's Position As A Real Estate Asset Manager

In his "Statement for Disability Benefits," Russell described his duties as Vice President and a Real Estate Asset Manager with CPI. Russell was primarily responsible for managing three shopping centers. He indicated that approximately 25 hours of a given 40 hour week was dedicated to coordinating the activities of various persons involved in the leasing and management of each property and review-

---

1. Paul Revere claims that Russell resigned from his position effective January 23, 1995. (D.I.25). Russell argues that he did not resign and was instead employed, but on unpaid medical leave of absence until January 23, 1997. (D.I.30).

2. Paul Revere preliminarily began paying benefits to Russell under the Individual Policy on May 17, 1995. It preliminarily began paying benefits under the Group Policy on July 21, 1995. (D.I. 31 at B–140).

3. There was an intervening colloquy between Paul Revere and Russell subsequent to the January 16, 1996 correspondence and prior to the April 11, 1996 appeal. Therein, Paul Revere originally interpreted a January 19, 1996 letter and additional submission of documentation as Russell's appeal of its decision. On February 12, 1996, Paul Revere requested a supplemental medical review including the additional documentation. Following the supplemental review, on February 14, 1996, Paul Revere notified Russell that it had affirmed its decision to deny him benefits. (D.I. 26 at A–171).

ing the budgets, marketing plans and property appraisals for each property. Russell noted that his duties included frequent travel to each property cite. (D.I. 26 at A–85). Next, Russell indicated that approximately ten to fifteen hours per week were allocated to planning the enhancement and expansion of these properties and coordinating the work of in-house and outside personnel associated with this effort. *Id.* Finally, Russell allocated approximately five to ten hours per week to the financial analysis of the properties, procuring mortgage financing and the sale or purchase of additional property interests.[4] *Id.* In response to "Part B" or the "Occupational Description" of the claim form which asked about the amount of lifting associated with his position, Russell selected the category: "sedentary." Sedentary was defined as involving sitting, walking or standing, and lifting objects between zero and ten pounds.[5] (D.I. 26 at A–86).

## B. The Available Medical Documentation

At the time of Russell's initial application for long-term benefits, he referred to fifteen separate items relating to his disability claim. Six items were responsive to "Item 15" of the claim form regarding "Hospitalization." Nine items were responsive to "Item 17" of the claim form

regarding "Other Physicians." (D.I. 26 at A–84.) On April 5, 1995, a supplement, in excess of 70 individual documents, was submitted to Paul Revere in support of Russell's claim. The balance of this documentation consisted of the results of numerous medical examinations and tests ordered by specialists to whom Russell had been referred, from approximately February 1992, to March 1995. These tests ran the gamut, from magnetic resonance imaging of Russell's spine, to biopsies of his liver and gallbladder. Though the examinations varied in type and scope, the result was a consistent failure to find a diagnosis for Russell's symptoms. Nonetheless, although they differed on the extent of his disability, Russell's attending physicians, Drs. Petito and Harris, found his symptoms to preclude him from performing his job. For his part, Russell indicated that the disability interfered with his job performance such that his "[c]hronic abdominal pain, combined with periodic nausea, as well as frequent muscle [and] joint pain result[ed] in fatigue, difficulty concentrating, [and an] inability to work for extended periods." (D.I. 26 at A–86).

## C. Paul Revere's Surveillance of Russell

Paul Revere's review of Russell's disability claim also consisted of private surveillance of Russell's daily activities on se-

---

4. Paul Revere does not dispute Russell's characterization of his duties. Paul Revere did specifically emphasize that Russell's position was "a primarily sedentary management job." (D.I.25). In addition, Paul Revere cited Russell's "job description," which described him as being responsible for managing three shopping centers (two in California and one in New Jersey) and his duties to include: (1) negotiating with major anchor tenants; (2) overseeing any expansion/renovation plans; (3) serving as a liaison with local officials; (4) involvement in the approval process of budgets, marketing plans, and lease plans; (5) involvement in approval of lease requests and

lease adjustments, etc.; and (6) analysis of properties with view a to purchase. (D.I. 26 at A–87).

5. This selection is relevant in that Paul Revere relied upon it as a basis for evaluating "total disability" as it applied to Russell's occupation. Paul Revere considered the selection an "admission" by Russell that his job was primarily sedentary in nature, and that ultimately, Russell was not "totally disabled" from his "sedentary" occupation. (D.I. 26 at A–159; 161).

lect occasions in October and December 1995, and May and June 1996. This surveillance was conducted to determine whether and to what extent Russell's disability affected his non-work related activities. Paul Revere initially employed an organization called International Claims Specialists ("ICS"), and then Legal Investigations, Inc. ("LI"), each of whom conducted surveillance on Russell and provided detailed reports of his activities outside the home. The surveillance revealed that Russell participated in various activities, including running errands, shopping, and transporting his child to and from day care. (D.I. 26 at A–150–52, 210–14). On several occasions, Russell was observed carrying luggage or packages of various sizes, and on one occasion, Russell was observed visiting a "Computer City" computer store where he spent the balance of one day.[6] (D.I. 26 at A–153, 156–58). However, Russell was never observed inside his house and thus, there is no independent record of the extent to which his disability impaired his activities while at home.

### D. Russell's Social Security Administration Disability Claims

On May 8, 1995, Russell filed a claim with the Social Security Administration ("SSA") seeking disability benefits. In the SSA's "Disability Report," Russell described his symptoms as he did in his claim to Paul Revere. In response to a question about how the disability changed his "work circumstances," Russell stated that, "[d]ue to pain & fatigue, travel schedule was severely limited. Attendance was affected by both symptomatic 'sick' days as well as doctor and hospital visits. Dates are not specific since affects [sic] have been cumulative." (D.I. 26 at A–76). Further, Russell indicated that relative to his daily job activities, he spent approximately five hours a day sitting, two hours standing and one hour walking. Russell's "bending" was only "occasional," although he described his "reaching" as "frequent," and his "heaviest weight lifted" was 20 pounds, while the "weight frequently lifted/carried" was "up to 10 lbs."

On August 1, 1995, the SSA decided to denied Russell disability benefits, finding no disability under its rules. (D.I. 32 at B–401). The SSA reviewed several reports regarding Russell's disability which were the same as those sent to Paul Revere.[7] Based upon the information submitted, the SSA considered Russell's condition not severe enough to keep him from working. Although the SSA acknowledged that Russell continued to experience some pain, the SSA determined that he was able to stand, walk, and move about without assistance. Thus, according to the SSA, the evidence indicated that he was able to perform his job as a real estate manager. *Id.* Although the SSA informed Russell that the ruling was appealable, he did not appeal the decision. (D.I.30, Ex. C).

6. As a result of the initial surveillance, on January 4, 1996, David Covino ("Covino") of Paul Revere met with Russell to discuss his claim. During the meeting, Russell admitted to having taken "a course or two at a local computer store." Russell also admitted to participation in recreational activities, including several hunting trips, though he specifically noted that he was unable to exercise properly or be as active as he had been previously. (D.I. 26 at A–156–58).

7. In evaluating Russell's claim, the Social Security Administration reviewed the following documents from: L. Harris, M.D. report dated 7/15/95; B. Lewis, M.D. records of 6/30/94 and 7/20/94; J. Negow, M.D. records of 11/29/93 to 12/6/93; C. CunninghamRundles, M.D. reports of 5/12/93 to 10/7/93; S. Selesnick, M.D. report of 4/1/93; P. Tsairis, M.S. records of 5/11/92 to 6/15/92; Cornell Medical Center records of 3/29/93 to 9/16/94. (D.I. 32 at B–401).

On January 29, 1996, Russell again applied to the SSA for a period of disability and disability insurance benefits. *Id.* Russell's application was denied on May 2, 1996, and again on reconsideration on December 12, 1996. On January 3, 1997, Russell filed a timely request for a hearing. As a result, a decision was issued by an Administrative Law Judge on January 20, 1998. The ruling which issued was partially favorable to Russell. Judge Pace found Russell "disabled" as defined by the Social Security Act commencing January 20, 1995. *Id.* In particular, Judge Pace found Russell's "impairments" to be "severe," as defined by the SSA, because they were found to "cause more than a minimal effect on his ability to function." [8] Though the judge found that Russell's capacity for sedentary work, his age, education and work experience classified him as "not disabled" under the applicable regulations, he also found that Russell's capacity for sedentary work was compromised because of exertional and non-exertional limitations. Thus, he was limited in the work he could otherwise perform. However, the judge noted that since Russell resumed "substantial gainful activity" on August 31, 1997, he would not be entitled to benefits after that date. *Id.*

## III. SUMMARY JUDGMENT STANDARD

Summary Judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340–41 (3d Cir.1990). The mov-

ant bears the burden of proving that there are no genuine issues of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A dispute is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-movant, and a fact is material if it might effect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) Finally, on any motion for summary judgment, the court must view the evidence in a light most favorable to the non-movant and draw all reasonable inferences in his favor. *Wetzel v. Tucker*, 139 F.3d 380, 383 n. 2 (3d Cir.1998). With these principles in mind, the court will consider the appropriate standard of review to be applied in this case.

## IV. DISCUSSION

### A. The Standard of Review

Under ERISA, a district court's review of a plan administrator's denial of benefits is generally *de novo* review. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). However, where the terms of a benefit plan reserve to the plan administrator discretion to determine a claimant's eligibility for benefits, the administrator's decision is subject to review under the "arbitrary and capricious" standard (i.e., a determination of whether the plan administrator abused its discretion in reaching its decision). *See Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 (3d Cir.1997). Where discretion is reserved, the court may overturn the administrator's decision only if it is " 'without reason, unsupported by substantial evidence or erroneous as a matter of law.' " *Abnathya v. Hoffmann–*

---

**8.** Adopting Russell's allegations, the administrative law judge found his "impairments" to include degenerative disc disease of the thoracic spine with accompanying pain, gastrointestinal complaints, paresthesias, and sympathetic dystrophy. (D.I.30, Ex. C).

*La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir.1993) (citations omitted). Additionally, when an administrator's decision is potentially clouded by a conflict of interest, such as where a plan administrator also funds the plan it administers, the conflict must be considered in assessing the amount of deference to be given to the administrator's decision. *See Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 387 (3d Cir. 2000). Thus, in those circumstances, a modified or "heightened" arbitrary and capricious standard of review is appropriate, *see id.* at 390–92.

### 1. The Discretionary Language of the Plans

■ As noted, application of the "arbitrary and capricious" standard of review requires that the policy language reserve to the plan administrator discretion to interpret the policy and to determine the eligibility of persons applying for benefits. Although an express reservation of discretion is preferred, discretion may reasonably be inferred from the policy language. *See Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 114 (3d Cir.1994) ("Discretionary powers need not be expressly granted; they may be implied by the plans terms.") (citing *Luby v. Teamsters Health Welfare & Pension Trust Funds,* 944 F.2d 1176, 1181 (3d Cir.1991)); *Nolen v. Paul Revere Life Ins. Co.,* 32 F.Supp.2d 211, 214 (E.D.Pa.1998) ("[D]iscretionary authority need not be expressly granted. Rather, it may be implied from the policy's terms as a whole.") (citing same).[9]

■ Indeed, the court finds the language of the Individual Policy to raise an inference of discretion. For example, in Part 9 of the Individual Policy regarding "Claims," the policy language indicates that no claims will be paid unless "[w]e receive satisfactory written proof of loss." (D.I. 26 at A–68). Language requiring "satisfactory proof" often implies an inference of discretion on the part of the plan administrator. In fact, several other circuit and district courts have found similar language to be discretionary in nature. *See, e.g., Snow v. Standard Ins. Co.,* 87 F.3d 327, 330 (9th Cir.1996) (finding that the words "satisfactory written proof" trigger the "arbitrary and capricious" standard of review); *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir.1996) (holding that "satisfactory proof of total disability" required the application of the same standard); *Donato v. Metropolitan Life Ins. Co.,* 19 F.3d 375, 379 (7th Cir.1994) (concluding the same given the terms "proof . . . satisfactory to us"); *Ceasar v. Hartford Life & Accident Ins. Co.,* 947 F.Supp. 204, 206 (D.S.C.1996) (employing the "arbitrary and capricious" standard since the language of the plan allowed the award of benefits only "if proof of loss is satisfactory") (quoting *Donato,* 19 F.3d at 379). Thus, although not stated explicitly, the reasonable inference is that the "proof of loss" be satisfactory to the plan administrator (i.e., Paul Revere).

■ The inference of discretion that arises from the language of the Group Policy is more attenuated, but nonetheless reasonable, when viewing the policy as a whole. In particular, the language of the Group Policy provides that Paul Revere exercises the right to require "written proof of financial loss," and "a medical

---

**9.** Although the court is cognizant of the recent decisions of the Second Circuit in *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243 (2d Cir.1999) and the Ninth Circuit in *Kearney v. Standard Ins. Co.,* 175 F.3d 1084 (9th Cir.1999), which have held that such implicit language triggers *de novo* review, controlling Third Circuit precedent, permits implicit reservations of discretion in policy language.

exam of any claimant as often as it may reasonably be required" prior to any award of benefits. (D.I. 26 at A–30). Further, any continuing disability coverage is subject to "additional [written] proof [of loss] as often as we feel is necessary, within reason." (D.I. 26 at A–39). Certainly, this language, like that of the Individual Policy, fails to expressly reserve discretion to evaluate eligibility under the plan. The court finds, however, that the import of language requiring medical exams "as often as reasonably may be required," or additional proof of loss "as we feel is necessary," establishes that proof of disability must be proven to Paul Revere's satisfaction before a claimant can continue to receive, or even qualify for, disability benefits. Finally, by reserving the "right" to require not only "proof of loss," but "additional proof of loss," the Group Policy pledges that Paul Revere will not blindly pay out benefits absent proof satisfactory to it, as the plan administrator. Instead, Paul Revere will thoroughly examine the evidence of the underlying claim, and if found to be unsatisfactory, require additional acceptable proof. If none is forthcoming, it will deny the claim. *See Pokol v. E.I. duPont de Nemours & Co.,* 963 F.Supp. 1361, 1371 (D.N.J.1997) (recognizing that the language of a plan may implicitly grant discretionary authority when it "permits the administrator to decide 'what sort of evidence may be required from the

applicant to provide a basis for the subsequent ... determination' ") (citations omitted). Therefore, the court finds the language of the Group Policy, as a whole, falls within the scope of the inferred discretion contemplated by the courts in *Hullett, Luby,* and *Nolen.* Thus, it is reasonable to conclude that the language of the Group policy implicitly reserves discretion to Paul Revere to determine a claimant's eligibility for benefits.

In addition, Russell's complaint concedes that Paul Revere has discretionary authority to determine eligibility.[10] (D.I.1). Having found that the language of the Individual and Group policies reserves discretion to Paul Revere to interpret the policies and determine a claimant's eligibility for benefits, the court will apply the arbitrary and capricious standard of review to evaluate Paul Revere's decision to deny Russell disability benefits.

### 2. The Conflict of Interest

Russell alleges that Paul Revere was operating under a conflict of interest when it denied his application for benefits because it funds, as well as administers, CPI's Individual and Group policies. Specifically, Russell alleges that "inconsistencies" in Paul Revere's position regarding Russell's claims, warrant an inference that the decision was motivated by self-interest.[11] (D.I.30). Thus, Russell argues,

---

**10.** Russell originally filed his complaint on September 26, 1996. On July 17, 1998, Russell filed a Motion to Amend the Complaint and a Motion for Summary Judgment. Paul Revere also filed a Motion for Summary Judgment. On May 25, 1999, the court held a hearing on Russell's motion to amend and the cross-motions for summary judgment. In his motion to amend, Russell sought to amend his admissions in paragraphs 10 and 11 of the complaint which conceded that Paul Revere was a fiduciary under the Group and Individual Policies "with discretionary authority to determine eligibility for benefits." (D.I.1). At

a May 25, 1999 hearing on the motions, the court denied Russell's motion to amend on the basis of prejudice and undue delay. The court then reserved judgment on the instant cross-motions for summary judgment.

**11.** Russell's alleged "inconsistency" arises from Paul Revere's subsequent termination of Group and Individual Long–Term Disability Benefits which were originally awarded to Russell on September 8, and October 13, 1995, respectively. (D.I. 32 at B–673–75).

since this conflict motivated Paul Revere's decision to deny benefits, the court should accord its decision little or no deference. Paul Revere argues that Russell has presented no evidence that the alleged conflict had any impact on the decision to deny benefits. In particular, Paul Revere asserts that Russell failed to prove that an actual conflict exists, and that the alleged conflict somehow affected the "reasonableness of the fiduciary's decision." (D.I.33).

The court agrees with Russell that a conflict of interest is present in this case. In *Firestone*, the Supreme Court held that when an administrator who has discretion to determine eligibility for benefits operates under a conflict of interest, that conflict "must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In *Abnathya*, the Third Circuit elaborated on the extent to which an administrator's interest might cause a conflict. The court found that where an administrator "incurs no direct expense as a result of the allowance of benefits, nor does it benefit directly from the denial or discontinuation of benefits," a conflict is unlikely. 2 F.3d at 45; *see also Mitchell*, 113 F.3d at 437. In *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377 (3d Cir.2000), the Third Circuit particularized the conflict, by noting that "typical" insurance companies are structured in such a way that their profits are directly affected by the claims paid versus the claims denied. 214 F.3d at 388. Further, the court observed that insurance companies, unlike employer-administrators, are

inherently resistant to the consequences of denying benefits, like higher wage demands or a loss of morale. As such, the court concluded, the "most important reason for deferential review is lacking." *Id.* at 389. Thus, it held that "a higher standard of review is required when reviewing benefits denials of insurance companies paying ERISA benefits out of their own funds." *Id.* at 390.

■ Although the specific details of the contractual arrangement between CPI and Paul Revere are unclear, it appears to the court to be a "typical" insurance relationship. That is, CPI pays a monthly premium to Paul Revere on behalf of its employees, and those "payments" are used to both fund the insurance plans and compensate Paul Revere. In recognition of this relationship, and given that the Individual and Group policies are indeed both funded and administered by Paul Revere, the court finds that a *Pinto*-type conflict is present. Therefore, a modified or "heightened" arbitrary and capricious standard of review is appropriate. At this juncture, the court will refrain from discussing whether an actual conflict affected the decision of Paul Revere to deny benefits either initially or on appeal. The court will address this issue below.

### B. Paul Revere's Denial Of Benefits

On January 16, 1996, following a subsequent review of Russell's claim and the supporting documentation, Paul Revere notified Russell of its decision to deny benefits under the Group Policy.[12] Paul

---

12. This "denial" was, in fact, a cessation of benefits. On May 17, 1995, Paul Revere began paying benefits to Russell under the Individual policy. (D.I. 31 at B–121). On June 29, 1995, a letter accompanied the disability check which indicated that the check was being issued on an "exceptional basis" in an effort to be of service to Russell. (D.I. 31 at

B–128). However, the letter did not explain what was meant by "exceptional." The letter noted that additional medical information was being requested from Russell's attending physician and indicated that Paul Revere would be in touch in the future. *Id.* Paul Revere continued to make these "exceptional" benefit payments through August of 1995.

Revere's letter indicated that it found Russell "[did] not continue to meet the definition of total disability" as defined in the Group policy documents. (D.I. 26 at A–162). Specifically, citing the policy language, Russell's occupational description, and the medical documentation submitted by his doctors, Paul Revere noted that it was "unable to determine any restrictions and/or limitations that would prevent [him] from returning to [his] sedentary occupation." (D.I. 26 at A–161). On January 16, 1996, Russell also received a similar letter regarding the Individual Policy. On January 19, 1996, Russell responded to the January 16 letters with additional medical documentation.

On April 11, 1996, Russell formally appealed his denial of benefits under both policies. In a subsequent letter, Paul Revere requested the submission of additional information, and noted that it would issue a decision within 60 days of receipt of the appeal. (D.I. 26 at A–190). On June 20, 1996, following review of Russell's claim on appeal, Paul Revere affirmed its earlier denial of Russell's claim for Group policy benefits. Citing the policy language and a job survey[13] for the position of

"Real Estate Asset Manager," Paul Revere concluded that Russell's file lacked "objective medical evidence of a condition which would preclude Mr. Russell from performing the duties of his occupation." (D.I. 26 at A–118–19). On June 28, 1996, Russell received a similar letter from Paul Revere regarding his Individual policy claim. The letter explained that after evaluating the submitted medical documentation, the plan language, and the independent analysis of his former position, Paul Revere found Russell's medical complaints to be inconsistent with his level of activity and found "no objective medical data to support restrictions and limitations that would prevent Mr. Russell from performing the duties of his occupation." (D.I. 26 at A–120–21). Thus, on appeal, Paul Revere again found Russell's condition did not meet the definition for "total disability" contained within the Individual and Group policies.

### 1. The Plain Language of the Plans

As previously noted, in Paul Revere's opinion Russell failed to demonstrate that he suffered a "total disability" within the

---

By letter dated June 30, 1995, Paul Revere notified Russell that it had sought additional current medical records for review in order to make a determination on his Group policy claim. (D.I. 31 at B–129). By letter dated July 21, 1995, Paul Revere notified Russell that it had not received the updated medical information needed to make a determination on his Group policy claim. Paul Revere also enclosed a payment from April 23, 1995 to July 23, 1995, which it again characterized as "extraordinary," but done in an effort "to be of service" to Russell. (D.I. 31 at B–140). On September 8, 1995, Paul Revere approved Russell's claim for benefits under the Group policy. However, the letter also noted that Paul Revere would continue to monitor Russell's claim on a monthly basis to determine continued eligibility. This review was to be supplemented by the periodic receipt of "Attending Physician Supplementary State-

ments" and monthly progress reports to be completed by Russell and his attending physicians. (D.I. 31 at B–673–75). By letter of October 13, 1995, Russell was awarded benefits under the Individual policy, also subject to periodic review. (D.I. 31 at B–675). Thereafter, payments were made to Russell, under both policies, until January 1996.

13. A "Job Analysis & Labor Market Survey" for the occupation of "Real Estate Asset Manager" as conducted by Pembroke Consultants at Paul Revere's request. (D.I. 26 at A–215–28). The survey was utilized by Paul Revere in its decision to deny benefits. However, due to the court's findings regarding the policy language and the supporting medical documentation, the survey is not pertinent to the evaluation of the propriety of Paul Revere's decision.

meaning of the applicable language of each plan. Under the Group policy, an employee is totally disabled when:

1. Because of injury or sickness, the employee cannot perform the important duties of his own occupation; and

2. The employee is under the regular care of a doctor; and

3. The employee does not work at all.

(D.I. 26 at A–16). Similarly, under the Individual policy, an employee is totally disabled when because of injury or sickness:

a. You are unable to perform the important duties of Your Occupation; and

b. You are receiving Physician's Care. We will waive this requirement if We receive acceptable written proof acceptable to Us that further Physician's Care would be of no benefit to You.

(D.I. 26 at A–58). Notably, the policies fail to define "important duties." The court finds that delineating the important duties of an individual's occupation is essential in assessing whether that person suffers a "total disability."[14] To this end, the court interprets "important duties" as being those duties necessary to the performance of one's occupation. Furthermore, the court finds the duties necessary to Russell's occupation as a Real Estate Asset Manager to be those duties listed in II(A), *supra*.[15]

The policy provides that an employee is totally disabled when that "employee cannot perform the important duties of his own occupation." It is unclear, however,

whether the employee must not be able to perform *any or all* of the important duties in order to be deemed totally disabled. The court finds the answer in the section of the Individual and Group policies entitled "Residual Disability." Among other things, the language of this section provides that a person may be found to be disabled if he or she is "unable to perform *one or more* of the important duties of [his or her] occupation." (D.I. 26 at A–17, 59) (emphasis added). As implied by this language, a "residual disability" is the disability remaining after recovery of the employee from the circumstances that rendered him or her disabled. See Webster's 3d New Int'l Dict. The employee who suffers a residual disability is entitled to a lesser benefit than the totally disabled employee. Thus, it would seem there is an expectation that the former will continue to work, in some capacity, in his or her occupation.

It is reasonable to assume that the employee who is totally disabled receives a greater benefit because he or she is completely unable to perform their job related responsibilities. That is, in the case of the totally disabled employee, it would seem reasonable to conclude that there is no ability to perform any of the important duties of his or her occupation. Simply put, the employee will not continue to work for the employer in any capacity in his or her occupation.

Finally, the court also finds that the policy language places upon the employee the initial burden to demonstrate that he

---

**14.** The court finds that conditions (2) and (3) of the Group policy and condition (b) of the Individual policy have been satisfied and are essentially not in dispute in this case.

**15.** The court notes that neither set of plan documents actually defines the term "impor-

tant duties." Russell, in his application for long-term disability benefits, is asked to list his duties in order of their importance. Russell complied with this request, and there is no evidence that either party disputes Russell's identification of his important duties.

or she can not perform *any* of the important duties of his position.

## 2. The Record Before the Administrator

The record before the administrator can be divided into two parts: (1) the information before the administrator upon initial review, and (2) the information before the administrator on appeal. The initial record, submitted April 5, 1995, included Russell's "Statement for Disability Benefits," his occupational description, statements from his attending physicians, a record of therapy, an employer statement, job description, a "DBL Claim Form" and approximately 70 additional documents which constituted examination results along with associated correspondence from doctors to whom Russell had been referred. The record also consisted of the surveillance of Russell which took place in October and December 1995, and the report of the January 4, 1996 "field visit" between Russell and Covino. On appeal, the record consisted of all the aforementioned items, as well as additional medical documentation submitted on January 19, 1996, and again on April 11, 1996. This set of submissions included a formal letter and argument for appeal prepared by counsel, records of additional examinations, monthly progress reports as required by Paul Revere and letters from Russell's attending physicians from April 1996. The record also consisted of the reviews of Dr. Marvin Goldstein and Dr. Joanne Zumwalt, medical consultants to whom Paul Revere had referred Russell's file, and the "Job Analysis & Labor Market Survey" produced by Pembroke Consultants. Since the appellate or "final" record is inclusive of the record upon initial review, the court finds that the appellate or final record is the entire record subject to review.

## 3. The Administrator's Decision to Deny Benefits

Because the court is applying the arbitrary and capricious standard of review, it again notes that its review is limited to the record that was before the administrator. *See Mitchell*, 113 F.3d at 440 (holding that under arbitrary and capricious review the record consists of that evidence before the administrator when he made the decision subject to review). As previously stated, the "record before the administrator" is the record on appeal or "final" record. The court also again notes that because Paul Revere was the plan administrator, and because this presents a conflict of interest, it will accord the administrator's decisions somewhat less deference. *See Pinto*, 214 F.3d at 390. Finally, the court is cognizant that the decisions of the administrator should be left undisturbed provided its interpretation of the evidence is rational and its decisions are not contrary to the policies' plain language. *See Moats v. United Mine Workers of America Health & Retirement Funds*, 981 F.2d 685, 688 (3d Cir.1992).

As directed by *Pinto*, the court will first determine the extent, if any, to which a conflict affected the decision of Paul Revere, as plan administrator, to deny benefits, and then determines what degree of deference should be accorded the administrator's decision. In *Pinto*, the Third Circuit determined that the asserted conflict had a negative impact upon the insurer's decision to deny benefits as demonstrated by: (1) the insurer's reversal of its original determination without the examination of additional evidence; (2) a self-serving selectivity in the use of evidence; and (3) a bias in decision-making to the benefit of the insurer. *Pinto*, 214 F.3d at 393–94. The court found these "procedural anomalies" suggested that the administrator's de-

cision should be viewed with "a high degree of skepticism." *Id.*

■ First, it is clear that unlike in *Pinto,* Paul Revere's decision to deny benefits was specifically predicated on its review of additional evidence. It is important to note that the language of both policies provides that Paul Revere reserves the right to require "additional" or "continuing" proof of loss in order to continue paying benefits. Paul Revere conducted a periodic review of the evidence. This included a review of the progress reports and the "activities check." Based upon this review, among other things, in letters of January 1996, Paul Revere notified Russell that he did not continue to meet the definition of total disability. Paul Revere's decisions were also based upon the other information contained in Russell's claim file. As previously noted, this information consisted of Russell's occupational description, the medical documentation submitted by his attending physicians, periodic progress reports and the "activities check." Based upon these things, Paul Revere notified Russell that it believed his "level of activity" did not support a continued finding of total disability.

Finally, Paul Revere realized no disproportionate benefit as a result of its decisions in this matter. Certainly, the payment of disability benefits to Russell on a preliminary basis during the review of his claims are not indicative of a "biased" deliberative process. Further, Paul Revere's original award of long-term disability benefits to Russell is inconsistent with a finding of bias on Paul Revere's part. Thus, the court does not find present in this case the *Pinto*-type "procedural anomalies" which would necessitate a particularly "heightened" standard of review. Instead, the court will apply an arbitrary and capricious standard of review with a high level of deference to the administrator, yet modified to the extent that our deference is not absolute.

■ In the January 16, 1996 letters, Paul Revere indicated that it was "unable to determine restrictions and limitations that would prevent [Russell] from returning to work in [his] sedentary occupation." (D.I. 26 at A–159). In particular, Paul Revere noted that Russell's cited limitations, including "'chronic abdominal pain, combined with periodic nausea, as well as frequent muscle and joint pain, resulting in fatigue, difficulty concentrating and inability to work long hours,'" coupled with the medical information submitted by his attending physicians and the "activities check," does not support a finding that Russell is "totally disabled." *Id.*

The court also finds that the vast majority of the supporting claim documentation do not support a finding of total disability. The medical examinations, although varied in type and scope, were consistent in the respect that they were unable to find a cause for Russell's symptoms. In fact, most of the examination results were "negative" or "normal." From the court's perspective, a synopsis of these exam results was persuasively captured in a March 14, 1994 letter from Rand Compton, M.D., to Dr. Petito. This letter was written in response to a prior referral and examination of Russell. In pertinent part, the letter stated that:

> Besides his pain, there are no symptoms or signs that suggest a disease process. All of the laboratory tests done here and elsewhere have been completely normal, and given the chronicity of his problem, it is our opinion that there is no significant pathology that can account for his pain symptoms.

(D.I. 31 at B–172–73.) This letter was preceded by two others. In the letter dated March 11, 1994, Dr. Compton wrote

that multiple CT scans, MRI scans, ultrasounds, and accompanying laboratory tests failed to reveal any pathology or significant abnormalities. Dr. Compton, however, ultimately found that Russell suffered from Chronic Pain Syndrome.

An associate of Dr. Compton, Barbara Bruce, Ph.D., made a similar assessment in an April 6, 1994 letter to Dr. Petito, where she also diagnosed Russell with Chronic Pain Syndrome. Both doctors also noted that Russell's reaction to their diagnoses was less than positive. Dr. Bruce remarked that Russell "appears quite fixed in his belief that he has a serious disease, and that his functioning will continue to spiral downward." (D.I. 31 at B–229). Dr. Compton noted that Russell "remains convinced that he has an undiagnosed pathologic process despite all of the evidence against this." (D.I. 31 at B–232). The doctor also stated that he did not feel that further testing would be of value.

The opinions of Drs. Compton and Bruce are only two of numerous evaluations of Russell's symptoms made in an attempt to determine the extent of his disability. The court highlights these opinions because they are arguably the most independent, objective, and candid reviews of the body of medical evidence presented in support of Russell's claims. Further, these opinions are emblematic of the difficulties experienced by numerous medical professionals in attempting to diagnose Russell's symptoms. As such, they illustrate the difficulty any plan administrator would have in reaching a finding of total disability upon review of Russell's claim. Thus, the court finds that an objective review of all of the medical evidence supports the conclusion that Russell suffered chronic pain prior to his resignation from CPI.

However, the extent to which Russell was disabled by his condition remains unclear. In fact, the plan administrator found that even Russell's attending physicians do not agree on this issue. While both Dr. Petito and Dr. Harris found Russell's symptoms precluded him from performing his job, they differ on the extent to which he is disabled. In pertinent part, Dr. Petitio noted that:

It is my belief that Mr. Russell is precluded from conducting his work as a real estate manager due to his illness, specifically by virtue of his intractable pain and chronic fatigue. The constant pain impairs his ability to sit and concentrate for long periods of time and, when combined with the fatigue, diminishes his ability to work extended hours or to endure extensive travel. While his pain is constant, the degree of pain varies from day to day such that his level of incapacity fluctuates. However, there is no pattern to predict the timing or duration of his acute painful episodes during which he is totally disabled. This, combined with the chronic component of his pain, the cumulative effect of his condition, and his constant fatigue, make it impractical for him to work at this time ... Given the reasonable probability that his illness is either viral or autoimmune in nature, rest and non-intervention represent the most appropriate course at this time. I do encourage him to engage in light recreational activities for exercise and to remain socially active.

(D.I. 32 at B–677–78). While reaching a similar diagnosis, Dr. Harris concluded that:

[Russell] suffers from chronic pain and I believe him to be unable to continue the level of work that he was doing prior to this chronic pain syndrome. I believe he is capable of doing sedentary office

work that does not require any heavy lifting or any extensive travel. I support his application for medical disability and do believe that he suffers from chronic pain that unfortunately varies in intensity from day to day.

(D.I. 32 B-676). Dr. Petito's overall assessment would appear to support the finding of a total disability. The court notes, however, that Dr. Petito specifically mentions "extended hours" and "extensive travel" as the only "important [job] duties" from which Russell would be precluded due to his "diminished" capacity. Thus, from this assessment, the court believes it is reasonable to conclude that due to Russell's fluctuating pain, his other important job activities, such as reviewing budgets or property appraisals, or planning the enhancement and expansion of the properties may be "impaired," but are not necessarily proscribed. On the other hand, Dr. Harris' opinion is reminiscent of a disabling condition that requires accommodation, as opposed to a cessation of all job related activities. The statements that Dr. Harris believes Russell "to be unable to continue his *level of work*," and that he is "capable of doing *sedentary office work*," do not suggest that Russell is prohibited from doing all of his "important duties," as is required under the policy terms.

Certainly, the opinions of Russell's attending physicians should be given significant weight as they have had the greatest opportunity to examine him and monitor his condition. However, these opinions should also be balanced against the body of medical documentation presented in support of Russell's claim. The court's review of this documentation as a whole does not suggest to it that a compelling case exist which would support a finding of total disability. In fact, as previously noted, the vast majority of examination results provide neither a diagnosis of the cause of Russell's symptoms or explanation for their severity.[16] Thus, the court, looking objectively at the medical evidence and the policy terms, finds it difficult to conclude that Russell was totally disabled from performing all of the important duties of his occupation as a Real Estate Asset Manager.

Furthermore, as noted in the letters to Russell, his admitted level of participation

**16.** To this end, of the 70-plus documents submitted in support of Russell's claim only the following noted "positive" test or examination results: (1) Deck, M.D., March 24, 1992, MRI Examination of the Cervical Spine; Impression: Mild degenerative disc disease at C5-6; (2) Tsairis, M.D., September 15, 1992, CT of the chest; Impression: Non-contrast CT examination of the chest demonstrating not focal pulmonary nodules. Mild degenerative disc disease is identified at the lower thoracic level; (3) Weinberger, M.D., September 26, 1992, Radiography of the entire spine and the pelvis; Interpretation: There is straightening of the normal anterior cervical lordosis, indicating muscle spasm; (4) Cunningham–Rundles, M.D., May 12, 1993; Finding an abnormality of lymphocyte function, as well as generalized lymphopenia; (although upon subsequent examination on October 7, 1993, Cunningham–Rundles, M.D., could no longer find anything wrong with Russell's immune system, and could no longer conclude that his immune system had any specific role in his condition); (5) Lewis, M.D., June 30, 1994; Impression that Russell's symptoms were not of intestinal origin, and believed the gallbladder may be the source of Russell's symptoms (however, following dissection of gallbladder on August 10, 1994, McSherry, M.D., commented that other than mild congestion, no active or significant chronic inflammation is seen in the gallbladder); (6) Labar, M.D., Ph.D., September 10, 1994, Peroneal Nerve Somatosensory Evoked Potential Report; Interpretation: Normal SEP on right side. Findings on left side indicate dysfunction above the lumbar cord; (7) Stassa, M.D., February 3, 1995, Serial films of the small intestine; Conclusion: Normal small intestine with the exception of thickening of the folds and some irritability of the post bulbar duodenum compatible with an inflammatory effect.

in non-job-related activities also appears inconsistent with a finding of total disability. The court finds that hunting, albeit undertaken intermittently, requires a level of exertion equal to or greater than that required by any of Russell's important sedentary job duties. In addition, surveillance of errand running (to gun shops, among other places), loading and unloading of luggage of various sizes, and participation in a computer class of several hours in duration, also tend to call into doubt the severity of Russell's disabling condition. *See Rowan v. Unum Life Ins. Co. of Am.*, 119 F.3d 433, 436–37 (6th Cir.1997) (finding video surveillance showing plaintiff engaging in a wide range of activities, including driving, sitting, and walking for prolonged periods, factually relevant, although not determinative).

Finally, the findings of the administrative law judge have no bearing on this court's determination whether the decision to deny benefits was arbitrary and capricious. Initially, the court notes that the "partially favorable" ruling issued by Judge Pace came a year and a half after Paul Revere's final decision on appeal. Second, even assuming Judge Pace's ruling preceded Paul Revere's decision, a plan administrator is in no way bound by the determination of the Social Security Administration, *see Kunstenaar v. Connecticut General Life Ins. Co.*, 902 F.2d 181, 184 (2d Cir.1990). *See also Moats*, 981 F.2d at 689 (when interpreting its own plan, administrator is not bound by federal standards or guidelines on disability, unless specifically incorporated). Third, a plan administrator's decision on ERISA disability that differs from that of the SSA is not arbitrary and capricious provided it is "reasonable and supported by substantial evidence." *Gaitan v. Pension Trust Fund of the Pension, Hospitalization and Benefit Plan of the Elec. Indus.*, No. 99

Civ. 3534 NRB, 2000 WL 290307, at *5 (S.D.N.Y. Mar.20, 2000); *Pokol*, 963 F.Supp. at 1379–80.

Although the court believes that the aforementioned evidence, taken as a whole, demonstrates that Russell's chronic pain likely hindered many of his important job duties, the court does not find that at any one time Russell was precluded from performing all of his important duties as defined under the Individual and Group policies. Therefore, the court concludes that Paul Revere's decision to deny Russell long-term disability benefits, initially on January 16, 1996, and on appeal, on June 20 and 28, 1996, was not arbitrary and capricious under the law.

### C. Russell's Procedural Violation Claim

In his motion for summary judgment, Russell asserts that Paul Revere failed to allow him to review the surveillance tapes made of his non-work related activities and to review the internal "medical referral" reports contained in his claim file. (D.I.30). He contends that this action constitutes a procedural violation under ERISA, for which he is entitled to a remedy. Paul Revere does not deny that it prohibited Russell from viewing the surveillance notes and videotape. It argues, however, that its failure to provide these tapes does not constitute a procedural violation. Furthermore, Paul Revere notes that subsequent to the release of the videotapes during discovery, it twice offered Russell the opportunity to submit additional information to refute the contents of the tapes, which would have been considered in another review of his case. According to Paul Revere, Russell refused on both occasions, indicating that there was no more information to submit. (D.I.25) Thus, Paul Revere argues that Russell was not prejudiced by the lack of an opportuni-

ty to review the tapes because he had nothing additional to submit that would have refuted the tapes' contents.

ERISA § 503 particularizes the standard of review that a plan administrator must follow in order to properly afford a claimant their rights of appeal upon denial of a claim. Specifically, the statute requires that: "In accordance with the regulations of the Secretary, every employee benefit plan shall ... (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133. In order for a plan administrator to meet the requirements of a "full and fair review," an administrator must "provide [the claimant] with an opportunity to examine [the] evidence and to submit written comments or rebuttal documentary evidence." *Hamilton v. Mecca, Inc.*, 930 F.Supp. 1540, 1552 (S.D.Ga.1996) (citing *Grossmuller v. International Union, United Auto., Aerospace and Agric. Implement Workers of America, UAW, Local 813*, 715 F.2d 853, 857–58 (3d Cir.1983)). The specifics of this review, as noted in *Grossmuller*, have been codified in *Review Procedure*, subparagraph (g) of 29 C.F.R. § 2560.503–1, as promulgated by the Secretary of Labor, which requires a plan administrator to allow a claimant on appeal to: (i) Request a review upon written application to the plan; (ii) Review pertinent documents; and (iii) Submit issues and comments in writing. 29 C.F.R. § 2560.503–1(g)(1)(i)–

(iii).[17] Presumably then, the failure of an administrator to allow a claimant to review pertinent documents or evidence for purposes of appeal. constitutes a procedural violation.

■■■ Typically, procedural violations of ERISA § 503 require a procedural remedy, such as remanding the claim to the administrator for a "full and fair review," unless the evidence clearly shows the administrator abused its discretion. *See Syed v. Hercules*, 214 F.3d 155, 162 (3d Cir.2000); *Weaver v. Phoenix Home Life Mutual Ins. Co.*, 990 F.2d 154, 159 (4th Cir.1993). However, not all procedural defects should upset the determination of a fiduciary, rather "substantial compliance with the regulations is sufficient." *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 382 (7th Cir.1994) (citing *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 694 (7th Cir. 1992)).[18] Therefore, a remand of this claim to the plan administrator is required, unless, this court finds that Paul Revere "substantially complied" with the applicable regulations in denying Russell's claim on appeal.

■■■ Upon review, the court finds that Paul Revere substantially complied with the requirements of the applicable regulations, and performed a "full and fair review" commensurate with § 1133(2). First, it is evident that, pursuant to § 2560.503–1(g)(1)(i), Russell was able to request a review of his claim upon written application, and formally did so on April 11, 1996. Second, pursuant to (iii) above,

---

**17.** This court understands the term "documents" to include any and all evidence considered by the plan administrator, including videotapes.

**18.** *Halpin*, and its predecessor case, *Brown v. Retirement Committee of the Briggs & Stratton Retirement Plan*, 797 F.2d 521, 536 (7th Cir. 1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1311, 94 L.Ed.2d 165 (1987), specifically

dealt with "substantial compliance" in terms of the "notice" due a claimant under § 1133 following the denial of a claim. However, as "notice" is integrally intertwined with and a prerequisite to the regulations set forth in § 2560.503–1(g)(1)(i)–(iii), the court finds that the "substantial compliance" standard is equally applicable to these regulations.

Russell was able to submit additional medical documentation, including the opinions of his attending physicians, and arguments on appeal (i.e., "issues and comments") in response to the deficiencies conveyed in the January 1996 letters denying his claims. Third, pursuant to section (ii), Russell was given notice of and an opportunity to review the progress reports, medical documents and other evidence upon which Paul Revere based its denial of Russell's claims. Paul Revere did not, however, afford Russell the opportunity to review the surveillance videotapes or the internal referral reports (i.e., the "pertinent documents") prior to filing his appeal. This is basis upon which Russell brings his procedural violation claim.[19]

The court finds that the information conveyed in the January 1996 letters, coupled with the information conveyed in the March 16, 1996 telephone conversation, *see* note 18, "substantially complies" with § 2560.503–1(g)(1)(ii). Although ideally, Paul Revere should have allowed Russell to view the videotapes and referrals prior to filing his claim, the court does not find this "defect" to be sufficient ground to "upset" the determination of the administrator. Similarly, the court does not find this "defect" to be a "genuine issue" which would preclude an award of summary

judgment. Thus, the court finds that Paul Revere satisfied its obligations under ERISA § 1133(2), and finds no procedural violation for which a remedy is required.

## V. CONCLUSION

For the foregoing reasons, the court concludes that there is no genuine issue of material fact as to whether Paul Revere acted arbitrarily and capriciously in denying long-term disability benefits to Russell under the Individual and Group policies. Having found Paul Revere's decision to be both reasonable and supported by the record, Russell's motion for summary judgment is denied, and Paul Revere's motion for summary judgment is granted. The court will issue an order to this effect in conjunction with this opinion.

### ORDER

For the reasons stated in the court's memorandum opinion of this date, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:

1. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendant's Motion for Summary Judgment (D.I.88) is GRANTED.

2. The plaintiff's Motion for Summary Judgment is DENIED.

19. Paul Revere did provide an opportunity to discuss, generally speaking, the surveillance conducted. On March 21, 1996, a telephone conversation occurred between Jon K. Wilhelmsen, Field Claim Representative for Paul Revere and Daniel Wolcott, Esq., counsel for Russell, regarding the claim file. Initially, Wilhelmsen told Wolcott that Paul Revere considered the surveillance video and reports "internal work product" which could not be released per company policy. (D.I. 26 at 185). Wilhelmsen further indicated that he could not detail the daily activities recorded in the surveillance, but that he could speak about the surveillance generally. Wilhelmsen specified the days the surveillance took place, indicated that these were "full days," but not 24 hour periods. (D.I. 26 at 186). Further, Wilhelmsen indicated that medical referrals were contained in Russell's claim file, described the internal processes of referral and review, and the reviewing doctors and dates. Finally, Wilhelmsen reiterated that the specific reasons for denying Russell's claims were specified in the January 1996 letters, and that in particular, since the medical records submitted did not reveal a diagnosis, they decided to conduct surveillance that revealed "an individual who was quite active." *Id.* Believing Russell's occupation to be sedentary in nature, Paul Revere found Russell capable of performing his occupation. The parties thereafter agreed that an "in-person meeting" was unnecessary. *Id.*

3. Summary Judgment be and hereby is ENTERED in favor of the DEFENDANT and against the plaintiff on all claims in the complaint.