Lawrence R. RAITHAUS,
M.D., Plaintiff

v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA, Defendant.

No. CIV. 03–00186ACKKSC.

United States District Court,
D. Hawai'i.

July 16, 2004.

David F. Simons, The Law Offices of David F. Simons, Honolulu, HI, for Lawrence R. Raithaus, M.D., plaintiff.

John R. Lacy, Randy L.M. Baldemor, Emily Reber Porter, Goodsill Anderson Quinn & Stifel LLLP, Honolulu, HI, for UNUM Life Insurance Company of America, defendant.

*ORDER GRANTING PLAINTIFF'S MO-*
*TION TO SUPPLEMENT ADMIN-*
*ISTRATIVE RECORD; GRANTING*
*IN PART AND DENYING IN PART*
*PLAINTIFF'S MOTION FOR SUM-*
*MARY JUDGMENT; AND DENY-*
*ING DEFENDANT'S MOTION FOR*
*SUMMARY JUDGMENT*

KAY, District Judge.

## BACKGROUND

Plaintiff Lawrence Raithaus, M.D. ("Plaintiff" or "Dr. Raithaus") filed this action under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B) ("ERISA") against Defendant UNUM Life Insurance Company of America ("Defendant" or "UNUM"). The Complaint claims that Defendant wrongfully denied Plaintiff's long-term disability benefits. The parties have cross-moved for summary judgment as to Plaintiff's claim for disability benefits. Plaintiff has also filed a motion to strike a surveillance videotape (U/A 1257) from the relevant administrative record or in the alternative to supplement the record with a declaration that addresses the videotape.

I. *Factual History*

The following facts have been culled from the parties' briefs and/or the administrative record.[1]

A. *Plaintiff's Employment at Kauai Medical Center*

Plaintiff became certified in family practice in 1979 but has practiced as a urologist since he was certified as such in 1981.

(U/A 835). Starting in May 1996, Plaintiff worked as a urologist for the Kauai Medical Center ("KMC"). During the time of his employment with KMC, Plaintiff was the only urologist on the island of Kauai.

On August 26, 2000, after more than a year of warnings regarding charting deficiencies, illegible notes, disorganization, and other forms of unprofessional conduct, KMC's Executive Committee informed Plaintiff by letter that they had decided to terminate his employment, pending his appeal of the termination. On August 30, 2000, one day prior to his injury, Dr. Lee Evslin, CEO of KMC, issued a letter to Plaintiff indicating that he was suspended and would be terminated unless he agreed in writing to comply with 21 new conditions for his continued employment. (U/A 298–303). By letters dated September 5 and 6, 2000, KMC informed Plaintiff that due to his refusal to comply with substance abuse testing, KMC's Executive and Quality Assurance Committees had voted to rescind the August 30, 2000 letter and were recommending Plaintiff's termination. (U/A 311, 312). On or around September 8, 2000, Plaintiff received notice that he had been terminated from his position at KMC and had the right to appeal the decision. (U/A 316).[2]

At the time he stopped working, Plaintiff was earning $16,677 per month. Plaintiff's compensation included membership in UNUM's long-term disability insurance plan (the "Plan"). The UNUM policy covered 60%, up to $10,000 per month, of Plaintiff's income if he became disabled under the Plan. Plaintiff also had an indi-

---

1. The Court notes that its discussion of facts is solely for the purpose of evaluating the instant motions and does not limit any determinations to be made by the ultimate trier of fact.

2. Plaintiff's attorney submitted a letter appealing the decision to terminate Plaintiff's employment on September 12, 2000. (U/A 317). Plaintiff's appeal was scheduled to be presented to the KMC Board of Directors on January 12, 2001. (U/A 325). While clearly Plaintiff was unsuccessful in his appeal, the record lacks documentation specifically addressing the outcome of the January 12th meeting.

vidual disability policy with New England Financial ("NEF") that covered him for an additional $1,500 per month if he became disabled.[3] Plaintiff has claimed and the record evidence indicates that the NEF individual policy has the same "regular occupation" language as the UNUM group policy at issue in this case. After filing suit against NEF for denial of his claim, Plaintiff and NEF agreed to a settlement. (Plaintiff's Concise Statement in Opposition to Defendant's Motion for Summary Judgment, ¶ 10 (citing *Lawrence R. Raithaus, M.D. v. New England Mutual Life Insurance Company*, CV 02–100, U.S.D.C. District of Hawaii, Gillmor, J.)).[4]

### B. *Relevant Plan Provisions*

For physician-participants, the Plan defines "disability" as follows:

> You are disabled when UNUM determines that:
>
> -you are limited from performing the material and substantial duties of your

regular occupation due to your sickness or injury; and

> -you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury....
>
> LIMITED means what you cannot or are unable to do.
>
> MATERIAL AND SUBSTANTIAL DUTIES means duties that:
>
> -are normally required for the performance of your regular occupation; and
>
> -cannot be reasonably omitted or modified.
>
> REGULAR OCCUPATION means the occupation you are routinely performing when your disability begins.

(U/A 209)(emphasis in the original).

When the policy was sold to KMC, an UNUM representative wrote a letter "Re: Kauai Medical Group—'Specialty Definition for Doctors'," explaining the policy as follows: [5]

---

**3.** Plaintiff asserts that NEF is "UNUM's corporate affiliate," citing a Southern District of New York case providing that UNUM has administered NEF's long-term disability claims with its own since NEF's parent company, Paul Revere, merged with UNUM in 1997. *See* Plaintiff's Reply Brief in support of its Motion for Summary Judgment, p. 7, fn. 1. Plaintiff has also referred to NEF as UNUM's "sister company." *See* Plaintiff's Counsel's letter of appeal, January 3, 2002 (U/A 23–30). In a January 8, 2003 letter brief for Magistrate Judge Chang in the NEF case, Plaintiff asserted that when he requested NEF's claims manual, NEF provided Plaintiff with UNUM's claim manual. *See* Plaintiff's Letter Brief Pursuant to L.R. 37.1, January 8, 2003, p. 3, fn. 3, CV 02–100 (HG/KSC).

In the NEF case, Defendant asserted to Magistrate Judge Chang that "Plaintiff's claim for benefits under his Unum Life policy was administered independently and separately from his claims under his New England Mutual policies. Plaintiff's Unum Life claim was administered in Glendale California while Plaintiff's New England Mutual claim was handled in Worcester, Massachu-

setts. Glendale and Worcester evaluated and made decisions regarding Plaintiff's claim, and communicated with Plaintiff and his counsel, separately." *See* Defendant's letter brief for Magistrate Judge Chang, January 8, 2003, p. 3, fn. 2, CV 02–100 (HG/KSC). Despite this statement by Defendant's counsel, the April and November 2001 denial letters in this case clearly indicate that UNUM reviewed NEF's decision before issuing its own decision to deny Plaintiff's claim for benefits.

**4.** The Court may take judicial notice of this prior case, which is a matter of public record. *See* Fed.R.Evid. 201(a-c); *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986) (taking judicial notice of motion to dismiss and supporting memorandum filed in related declaratory judgment suit).

**5.** At the hearing, defense counsel argued that this letter pertains to a different policy, other than the one at issue in this case. However, this letter was written within months of the effective date of the policy at issue and there is no evidence in the record indicating that this letter pertains to any other policy.

If a heart surgeon changed his occupation to a general practitioner due to a disability and the inability to continue surgical procedures, subsequent to policy onset, this individual would no longer be performing the duties of his previous occupation. . . .

Even if a contract does not have a specialty definition, a surgeon can still receive benefits if they are now performing the duties of a general practitioner, this is because we pay benefits not based on the title of an occupation but on the material duties of an occupation. In your example, a heart surgeon was no longer able to perform surgery and therefore moved to a general practitioner non-surgical position. With this change in duties, the individual also experienced an income drop of $150,000 originally to $75,000 under the general practitioner position.

We would pay a benefit in this example because there was an income loss due to the inability to perform the duties of the surgical occupation. We consider a heart surgeon and a general practitioner to be separate occupations and the salary and the job duties are also different. *The specialty definition would not make a difference in this case.*

(U/A 1046)(emphasis added).[6]

Regarding how long UNUM will continue to send payments to a claimant, the Plan states the following:

We will stop sending you payments and your claim will end on the earliest of the following:

Physicians, CEO, Vice Presidents and Mid Level Providers

-when you are able to work in your regular occupation on a part-time basis but you choose not to;

-the end of the maximum period of payment;

-the date you are no longer disabled under the terms of the plan;

-the date your disability earnings exceed the amount allowable under the plan; or

-the date you die. . . .

PART–TIME BASIS means the ability to work and earn between 20% and 80% of your indexed monthly earnings.

(U/A 218) (emphasis in the original).

**C. *Plaintiff's Medical Condition***

Plaintiff has a long history of back problems including degenerative disc disease throughout his lower back and he has undergone two lower back surgeries.

On August 31, 2000, while performing surgery, Plaintiff sustained what he claims was a disabling lower back injury. Defendant disputes the seriousness of the alleged injury Plaintiff sustained, and argues that Plaintiff is not "disabled" under the Plan. Plaintiff had an emergency room physician treat him on September 1, 2000 and obtained pain medication from another doctor. Due to the injury, Plaintiff did not return to work immediately. During the week following his injury, Plaintiff was formally suspended and then terminated from his position at KMC, pursuant to the

---

6. In February, 1996, NEF sent Plaintiff a similar letter regarding his individual policy that provided, in relevant part:

Your policy, which includes coverage for 'Total Disability In Your Occupation,' provides that you would be considered Totally Disabled if, because of injury or sickness, you were unable to perform the important duties of Your Occupation and were receiving appropriate physician's care.
By 'Your Occupation,' we mean the occupation or occupations in which you are regularly engaged at the time disability begins. We understand your current occupation to be that of a specialist in the field of urological surgery.
(U/A 28).

written warnings of termination he had received just prior to his injury.

### D. *Initial Review and Denial of Plaintiff's Claim*

In November 2000, UNUM received Plaintiff's initial claim for long-term disability benefits. (U/A 661–662). On the claim form Plaintiff stated that his occupation was "Urological Surgeon." Plaintiff indicated that he was unable to work due to "low back pain with radiation to right leg."

UNUM began paying benefits to Plaintiff "under a Reservation of Rights" in November 2000. *See* First Amended Complaint, p. 6, ¶¶ 27; Answer to First Amended Complaint, p. 6, ¶ 28. Plaintiff claims that Defendant ceased paying these benefits in April 2001, but Defendant denies this allegation. *See* First Amended Complaint, p. 6, ¶¶ 29; Answer to First Amended Complaint, p. 7, ¶ 30.[7]

UNUM obtained a January 8, 2001 Diagnostic Imaging report stating that there was "very little change" between Plaintiff's May 11, 2000 MRI (pre-injury) and his September 7, 2000 MRI (post injury). (U/A 439–440).

On March 5, 2001 UNUM Senior Customer Care Specialist Annie Paik received Plaintiff's personnel file from KMC. (U/A 252). From the file, "UNUM also learned of work-related information that further called into question Plaintiff's disability.... Interestingly, Plaintiff was notified of his imminent termination both five days and one day prior to the alleged onset of his disability on August 31, 2000. KMC officially terminated Plaintiff as an employee on or about September 8, 2000." (Defendant's Concise Statement in Support of its Motion for Summary Judgment,

¶ 9, citing U/A 286, 288–290, 294–295, 298–304, 515, 661–662, and 316).

On March 20, 2001, UNUM Field Representative Ed Ruiz interviewed Plaintiff. (U/A 1172–1180). According to Mr. Ruiz' report "80 percent of Dr. Raithaus' duties consisted of treating patients in the clinic and conducting hospital consultations" while "[t]he other 20 percent of Dr. Raithaus' duties involved the performance of surgery...." (U/A 1174).

On March 10, 2001, Dr. Leonard Cupo conducted an independent medical evaluation ("IME") of Plaintiff. Dr. Cupo's April 13, 2001 report included the following:

> The employee has a long history of low back problems dating back to 1978. By his report, he has had two surgical procedures...he reported residual right lower extremity pain, which he managed on his own with rest, medication and a home exercise program including swimming. He developed low back pain in January 2000...The employee attributed his low back pain to prolonged standing while doing surgery as a physician/urologist for Kauai Medical Clinic. An MRI scan...was done on 5/11/00, which showed multiple-level degenerative disk and joint disease of the lumbosacral spine. It would be important to review these previous medical records in order to more clearly define the employee's pre–8/31/00 injury state....
>
> Based on the employee's history and the medical records available for review, it is my medical opinion that the employee aggravated his preexisting degenerative disk and joint disease of the lumbrosacral spine on 8/31/00, as previously described. The level most severely involved with degenerative disk and joint disease is the L4–5 level. This is also

---

**7.** While it investigated Plaintiff's claim, NEF also made payments to Plaintiff until September 2001. Plaintiff received workman's compensation payments as well.

the same level at which the employee had two surgical procedures performed in the past.... The fact that electro-diagnostic studies did not show acute denervation suggests that the findings are chronic and predated the 8/31/00 injury. The fact that the MRI scan of the lumbosacral spine of 9/7/00 is unchanged from that done on 5/11/00 is also reassuring and indicates that no new major structural damage has occurred....

Despite the absence of objectively definable changes in the employee's condition following the 8/31/00 injury, the employee's subjective symptoms have escalated. He has received appropriately conservative treatment to date, and he has achieved at least partial improvement of his low back pain....

With regard to work, the employee is not currently fit to perform surgery due to the requirement of prolonged standing and leaning.... While completing further treatment, the employee may return to work in a limited-duty capacity with the following restrictions: no sitting or standing greater than 30 minutes consecutively without allowing a five-minute positional break; no squatting; no bending greater than four times per hour; no lifting greater than 10 lbs. These limitations are consistent with what the employee stated he could do and demonstrated during examination without significantly worsening his low back pain. I anticipate that the injury of 8/31/00 will turn out to be a temporary aggravation of the employee's preexisting low back condition. He will require a formal permanent partial disability evaluation in the future, once he completes further treatment.

(U/A 797–99).

Dr. Dwight James Lin conducted a second IME on April 18, 2001. His June 2001 report provides the following:

Prior [to Plaintiff's August, 2000 injury] L.R. was working full time, full duty as a Urologist on Kauai. He reports that 'once or twice a week' after performing 'extended procedures' in the operating room, he would experience transient exacerbations in his low back pain that could be managed with ibuprofen and local heat. Typically by the following day, he would 'wake up the next day, and feel okay after some stretching exercises';symptoms would spontaneously taper off and resolve 'over the following day or two.' ... From a functional standpoint, L.R. reports that 'My lifestyle was unaffected by my back...' and that he was able to perform urological procedures in the O.R. by avoiding heavy lifting, taking stretch breaks, and repositioning himself frequently.... While he did not exercise regularly, he was able to swim, play tennis once a month and occasionally ski. He was able to sit or drive for prolonged periods of time as long as he could 'take a stretch and walk a little.'...

Based upon my findings during the history, physical examination, and records review, Mr. Raithaus' symptoms are consistent, although there may be some symptom magnification. While I do not believe that he is able to continue a physically demanding Urology practice as the only such specialist (covering the call-schedule single-handedly) on Kauai, he should have been (and continues to be) able to return to some type of modified or light duty, even if only on a part time basis....

Given that Mr. Raithaus' clinical condition is stable (i.e., there is no evidence of acute denervation or bony instability,) had I been the treating physician, I would have already initiated the following:

a) Recommended that Mr. Raithaus increase his activities as tolerated

b) proactive physical therapy regimen, transition to work simulation and conditioning, and a functional capacity evaluation delineating his physical limitations (for a final impairment rating) and case closure....

It is not medically necessary for Mr. Raithaus to be completely off work....

Whether he will ever have complete resolution of his condition or impairment is unlikely, although he should be able to return to some type of gainful employment as a Physician....

Based on my evaluation, I recommend that Mr. Raithaus avoid activities that require him to stand in a fixed or awkward position, heavy lifting >15–20 lbs, or repetitive bending/lifting/twisting at the waist.

Mr. Raithaus did say that in the past he had worked as a Family Practitioner, and when I suggested the possibility of returning to it as a specialty, he was amenable and open to it from the standpoint that such a specialty would not be as physically demanding as that of a Urologist who spends a significant amount of time performing interventional procedures in the O.R. Mr. Raithaus was concerned, however, about how much retraining he would require to practice any other type of medicine other than Urology at this late stage of his medical career....

Mr. Raithaus has a fair to poor prognosis for return to employment based upon his 9 month hiatus from work thus far....

Emphasis must be placed upon objective goals...By focusing upon such goals, Mr. Raithaus' treating physician can then focus upon what Mr. Raithaus is capable of, rather than subjective complaints of pain and a perpetual off-work status.

(U/A 1004–1016).

On August 9, 2001, UNUM informed Plaintiff that it was inclined to deny his initial claim for benefits but would not issue a final decision until NEF issued its final decision regarding Plaintiff's individual policy. UNUM indicated that benefits would likely be denied because: [1] Dr. Lin suggested the possibility of "symptom magnification"; [2] the various IMEs opined that Plaintiff could return to a modified work schedule; [3] as opposed to Plaintiff's coverage under his individual policy with NEF, under the UNUM Plan, Plaintiff's "regular occupation" was a general practice physician, not as a urologist or specialist; and [4] Plaintiff's medical limitations did not prevent him from practicing as a general or family practitioner. (U/A 1064–65).

Sometime between August 25 and August 28, 2001, John Clancy, an UNUM Rehabilitation Consultant, referred Plaintiff's case to Genex Company for a labor market survey assessing Plaintiff's ability to obtain appropriate work given his medical restrictions and professional abilities. (U/A 983–1000). The Executive Summary regarding non-surgical urology positions in Hawaii provided, in relevant part, the following: "Over sixty employers were contacted across Urology and Fertility Clinics that provided similar responses *indicating non-surgical urological positions did not exist.*" (U/A 993) (emphasis added). In Los Angeles, "[a]ll reported that *the position of Urologist, non-surgical did not exist.*" (U/A 989) (emphasis added). The Genex survey also revealed that Dr. Raithaus might be considered for a General Practice/Medical Clinic Physician position. (U/A 986–87). Full-time general practice positions in Hawaii and Los Angeles earn

between $6933.33 and $10,400 per month. (U/A 983).

On August 29, 30, and 31, 2001, NEF authorized video surveillance of Plaintiff in order to determine his physical capabilities. (U/A 1257); (*See also* September 12, 2001 report on surveillance, U/A 912–943). In the video, Plaintiff can be seen bending, bicycle riding, lifting his bicycle in and out of his car, swimming, diving under waves, and body surfing in significant wave action, and pulling his son on a boogie board through water and over sand.

On September 25, 2001, Plaintiff sent a letter to Dr. Lee "Bill" Evslin, the CEO of KMC, asking to be re-hired at half or three quarters time. (U/A 837).

On October 11, 2001, NEF issued a letter to Plaintiff updating him on the status of his claim. (U/A 945–951). This letter contains a breakdown of the number of surgical versus non-surgical procedures Plaintiff performed in 1999 and 2000. In the almost two (2) years preceding his injury, Plaintiff performed an average of 57 surgeries per month, which constituted approximately 32% of his total billing. (U/A 945–46).

NEF claimed that its analysis revealed that "a much larger percentage of [Plaintiff's] earnings and [Plaintiff's] duties performed were involved in the non-surgical aspect of [Plaintiff's] occupation." (U/A 946). This letter also refers to comments made by Plaintiff indicating that he spent approximately 20% of his time performing surgery. (U/A 946–947). Finally, the letter states that Plaintiff's medical condition seemed to be improving by his own account and that NEF had "observed [Plaintiff] frequently engaging in activities inconsistent with [his] claimed impairment." (U/A 947). Finally, NEF recited the various work-performance warnings Plaintiff had received while employed by KMC, his suspension and eventual termination. (U/A 947–949). NEF concluded that:

"After a careful review of the available medical records, independent medical examination, billing codes, and independent assessment of your activities, we do not believe there is satisfactory proof that your condition, as reported, continues to render you completely incapable of working in the duties you described as being 80% office based urology." (U/A 950)(emphasis added).

On November 5, 2001, UNUM issued a final denial of Plaintiff's initial claim. (U/A 909–911). This decision came approximately one year after Plaintiff's initial claim. UNUM provided the following reasons for the denial: [1] Plaintiff is "capable of working 80% office based urology"; [2] NEF had "obtained information showing [Plaintiff's] activities are inconsistent" with his alleged medical condition (the NEF letter indicated that this "information" was obtained through some form of surveillance. *See* U/A 947); and therefore [3] Plaintiff is not disabled from the material and substantial duties of his occupation. The November 5, 2001 letter informs Plaintiff of his right to appeal the denial. (U/A 909).

Also on November 5, 2001, Plaintiff's attorney faxed to UNUM a November 1, 2001 letter from Dr. William Yarbrough describing the nature of urology practice:

urology is both a medical specialty and a surgical specialty. It differs from other specialties in that it is not exclusively one or the other. In cardiac care, for example, cardiologists manage the medical and diagnostic aspects. They do not do any 'cutting.' Any 'cutting' falls in the realm of cardiac surgeons. Urologists, on the other hand, are expected to do both. When a patient is referred to a urologist, it is the expectation of the referring physician and patient that all

necessary medical and surgical urologic care will be provided by the urologist. (U/A 3).

Plaintiff also provided UNUM the November 7, 2001 letter from his treating physician, Doctor Gilbert Hager (U/A 829–30). Dr. Hager diagnosed Plaintiff with various "lumbosacral" conditions and recommended the following:

Dr. Raithaus cannot meet the physical requirements of a physician in the operating room, because of his medical conditions. He cannot tolerate the leaning over that is required of a doctor in the operating room, or the prolonged standing, which also is required. He cannot wear a leaded apron for any length of time as is often required in urological surgery. . . .

I have reviewed the Dictionary of Occupational Titles put out by the Department of Labor for urologists and find that Dr. Raithaus is not able to perform the material duties set forth for urologists in that dictionary. Specifically, he can no longer perform surgery as indicated above, nor can he do the standing for prolonged periods of time, or bending that is often required of the urologist during the physical examination. . . .

The conditions that Dr. Raithaus suffers from are now permanent, and it is my opinion that he will never· be able to return to perform the material duties of an urologist because of his medical condition. . . .

Given the condition of Dr. Raithaus' back, he would not be able to perform as a family practice physician. He is limited to the extent he is able to return to work at all, to perform jobs that were strictly sedentary.

At the present time, Dr. Raithaus remains unable to return to any full-time work and will never be able to return to

work as an urologist, or in any job that is not purely sedentary.

(U/A 829–30).

On November 8, 2001, UNUM wrote to Plaintiff's attorney and reiterated that Plaintiff's claim was denied because "he is qualified to perform the material and substantial duties of a general practice physician, and that his current restrictions and limitations would not preclude him from performing the material and substantial duties of that occupation." UNUM emphasized that "the policy under which Dr. Raithaus was covered as of his last day worked [sic] did not have a specialty definition for physicians. The policy insures physicians for the practice of medicine. It does not insure them for their sub-specialty or discipline." (U/A 905–906). Relying on "Salary.com" the November 8 UNUM letter also indicated that as a Family Practice Physician practicing in Hawaii or Los Angeles, Plaintiff could earn about 80% of his previous income as a urologist. (U/A 905–906).

**E. *Appeal and Final Denial of Plaintiff's Claim***

On January 3, 2002, Plaintiff appealed the denial of his claim. (U/A 23–30). In his appeal, Plaintiff raised the following arguments:

[1] NEF, UNUM's "sister company," insured Plaintiff as a "urologist" and their policy was practically a verbatim copy of UNUM's policy. UNUM did not make any effort to distinguish the two policies, therefore Plaintiff should be covered as a urologist, not as a general practice physician, under UNUM's policy. In support of this argument, Plaintiff also cited UNUM's 1995 letter to KMC explaining that a heart surgeon need not be classified as a specialist to receive benefits if s/he can-

not perform one of the material and substantial duties of the job;

[2] The various IME's and UNUM's own assessment clearly indicate that Plaintiff cannot perform surgery, which is a material and substantial duty of a urologist;

[3] There are no jobs available in Hawaii or Los Angeles for a non-surgical urologist; and

[4] Plaintiff could not earn 80% of his monthly indexed earnings as a general practice physician in Hawaii.

On January 15, 2002, UNUM informed Plaintiff's attorney that his appeal had been filed and that UNUM would "attempt to make a determination on your claim within 60 days after receipt of this appeal, unless extenuating circumstances require additional time to make that determination. In the event of extenuating circumstances, we will make a determination no later than 120 days from receipt of the appeal." (U/A 32 and 849).

On January 18, 2002, Plaintiff's attorney faxed to UNUM the report of orthopedic surgeon John Smith, indicating that Plaintiff may require back surgery. (U/A 33–34). On January 29, 2002, Plaintiff's attorney faxed to UNUM Dr. Cupo's IME,[8] Dr. Endicott's December 2001 workers' compensation "Permanent Impairment/Disability Rating" report, a vocation evaluation report by Plaintiff's workers compensation adjustor John Mullen & Company, and Dr. Terry Smith's medical report recommending that Plaintiff undergo surgery. (U/A 37–92).

Notably, the vocation evaluation report obtained a "representative job description" of "Urologist" from the Department of Labor's Dictionary of Occupation Titles ("DOT"). (U/A 71). The DOT definition of "Urologist" is as follows:

Diagnoses and treats diseases and disorders of geniourinary organs and tract: Examines, patient, using x-ray machine, fluoroscope, and other equipment to aid in determining nature and extent of disorder or injury. Treats patient, using diathermy machine, catheter, cystoscope, radium emanation tube, and similar equipment. *Performs surgery, as indicated.* Prescribes and administers urinary antiseptics to combat infection.

(U/A 81) (emphasis added).

Dr. Endicott reported the following:

He is pleasant, cooperative and in no acute distress. He is oriented, alert and communicates well. He does not display excessive pain behaviors....

5/11/00 and 9/7/00 MRI scans of the lumbar spine-please see radiology report. There did not appear to be any significant change between the two studies....

Causality for work-related aggravation of his underlying significant degenerative disc and joint disease appears directly related to the 8/31/00 injury....

In regard to stability, he has reached maximal medical improvement from a conservative treatment standpoint for rating purposes as of this date....

It appears that approximately 75% of his impairment is related to the pre-existing condition, and 25% is related to the permanent aggravation. It does appear that there was an increase in permanent impairment based on this injury. There are subjective and objective findings that would indicate a worsening of his preinjury condition....

Even if his regular urology duties were available, he would not be able to do his regular work duties. He would not be able to perform surgery based on his

---

8. Dr. Cupo's IME was discussed previously. It was performed in April 2001. It is not clear who authorized this IME and when UNUM first received it.

examination today, because of the aggravation of symptoms due to prolonged standing, leaning, and the need to help lift and adjust patients after they are under anesthesia.... He would be precluded from performing surgery because of the need to consistently and repeatedly go beyond his physical capacity, putting himself and the patient at risk for problems.

(U/A 804–818).

On February 6, 2002, Plaintiff submitted to UNUM the January 27, 2002 "Vocational Opinion" by Carol Forsloff, a Forensic Rehabilitationist/Life Care Planner, indicating that:

Dr. Raithaus' income potential has been substantially decreased by his physical limitations. He will earn at best little more than 50% of his previous income as a urologist, since he will be at entry level in general or family medicine, if he is able to continue practice at all as a physician. With experience he will still earn considerably less than his reported basic monthly earnings at the date of disability of $16,667/month or $200,004. At entry level in family medicine he would earn $74,315 to an average of $117,101. Even at the average wage his earnings would be 58% of his previous income using the Department of Labor, State of Hawaii, statistics. At the entry level, which corresponds to the mean of the first third of the wage distribution, he would earn 37% of his previous wage. This has been verified by direct contact with employers as well as by a practicing physician in general medicine/family practice in the State of Hawaii.

(U/A 772).

UNUM's records indicate that on February 7, 2002, UNUM Senior Customer Care Specialist Carolyn Brooks left a telephone message for Plaintiff's attorney asking whether he intended to submit additional medical information or whether it was appropriate to refer Plaintiff's claim back to UNUM's medical department at that time. (U/A 787).

On February 19 2002, UNUM in-house Doctor Gritton wrote: "Claimant has multiple physicians who feel he can't return to operative urology practice. I am in agreement with this." (U/A 117).

On March 4, 2002, in response to Ms. Forsloff's report indicating that at most, Plaintiff would make 58% of his previous income, John Clancy of UNUM completed an Occupational Report Addendum. Referring back to the September 2001 labor market survey conducted by Genex and a February 2002 letter written by Plaintiff's attorney, Mr. Clancy concluded that "while there is a professional difference of opinion based on the individual surveyed, it is clear that the labor market survey clearly established that an individual with Dr. Raithaus' specific restrictions and limitations could be considered for employment based on his education, training, and experience." (U/A 126).

On March 22, 2002, UNUM Senior Customer Care Specialist Carolyn Brooks wrote a letter to Plaintiff's attorney informing him that among UNUM's Medical Department, "It was agreed that Dr. Raithaus is unable to perform surgeries." Regardless, "the labor market survey clearly established that an individual with Dr. Raithaus' specific restrictions and limitations could be considered for employment based on his education, training, and experience.... This appeal is being processed in accordance with our standard procedures. The Quality Performance Support Unit will make a final determination within timeframes set forth in the applicable ERISA regulations." (U/A 129–30).

On March 28, 2002 UNUM denied Plaintiff's appeal for the following reasons:

By your client's own admission and the data obtained from your client's former employer, it appears that your client's non-surgical duties and earnings made up 80–90% of his duties and earnings. Based on all the information compiled, it appears that had your client not been terminated from his employment due to performance issues, around the time in which his claim began, he would have had the capacity to return to work in his occupation, at the very least on a part-time basis.

and

In addition, it appears that the level of functional capacity as reported by your client and demonstrated for Independent Medical Examiners and Field Investigators appear to be inconsistent. For example...documented observation that was completed August 2001 indicates that [Plaintiff] was not wearing a back brace as he was biking, swimming, body surfing, pulling his 7 year old son on a boogie board in the sand with his left arm, and bending and twisting. These activities were also noted to have been done with no apparent pain or difficulties.

(U/A 134).

In support of this second reason, UNUM cited Dr. Lin's reference to possible "symptom magnification," Plaintiff's interview with an UNUM Field Investigator at which Plaintiff used a cane and was limping, and the video surveillance conducted in August 2001 showing Plaintiff bending, biking, swimming, body surfing, and pulling his son on a boogie board, without the aid of a cane, or back brace

and with "no apparent pain or difficulties." (U/A 134).

In an April 3, 2002 letter to UNUM, Plaintiff's attorney informed UNUM that Plaintiff had begun part-time work at Halele'a Family Medicine LTD. on March 4, 2002. (U/A 137–138). Plaintiff's attorney described Plaintiff's new work as "purely sedentary work as a non-surgeon on a part-time basis with no lifting, bending or awkward positions" and requested that UNUM and/or NEF pay partial disability benefits to Plaintiff. (U/A 137). UNUM denied Plaintiff's request for partial disability benefits on the basis that Plaintiff was no longer eligible for benefit payments because they had ended approximately one year prior. (U/A 141).

On December 6, 2002, Plaintiff's attorney requested in writing that UNUM provide Plaintiff with a copy of the surveillance video. (Plaintiff's Motion to Strike, Ex. 2). This letter was not admitted into the administrative record. On December 17, 2002, UNUM Lead Appeals Specialist, Joann Cho, sent a letter to Plaintiff's attorney indicating that UNUM was not legally required to release the video because it was not "pertinent" to their decision. Instead, UNUM had provided Plaintiff with a copy of the surveillance report, found at U/A 912–943. (Plaintiff's Motion to Strike, Ex. 3). This letter is also not in the administrative record. On January 9, 2003, Plaintiff sent a letter of complaint to the United States Department of Labor to report UNUM's allegedly wrongful withholding of the surveillance video. (Plaintiff's Motion to Strike, Ex. 4).[9] At some point after Plaintiff sent his letter of com-

---

**9.** It is not clear whether the Department of Labor contacted UNUM. However, the Court takes judicial notice of the related NEF case, CV 02–100, *Lawrence R. Raithaus, M.D. v. New England Mutual Life Insurance Company*, U.S.D.C. District of Hawaii, Gillmor, J.

On January 14, 2003 Magistrate Judge Chang ordered NEF to produce the surveillance videotape to Plaintiff within 48 hours after Plaintiff's deposition, which was not to take place later than January 31, 2003.

plaint, UNUM released the video to Plaintiff.

## II. *Procedural History*

Plaintiff filed the Complaint and demand for jury trial on April 22, 2003. A first amended complaint was filed on May 12, 2003. Defendant answered on August 14, 2003.

On February 23, 2004, the Court granted Defendant's motion to dismiss Plaintiff's state law claims because they are preempted by ERISA.

Each party filed a motion for summary judgment on April 14, 2004. The parties filed their oppositions to the other's motion for summary judgment on May 27, 2004. Replies were filed on June 3, 2004.

On May 26, 2004, the Court ordered that Plaintiff's motion to strike a surveillance video from the administrative record or in the alternative to supplement the record with the declaration of Plaintiff's treating physician be scheduled for hearing on June 14, 2004, with the motions for summary judgment. Pursuant to that Order, Defendant filed its Opposition to the Motion to Strike on May 27, 2004. Plaintiff filed his Reply on June 3, 2004.

### *SUMMARY JUDGMENT STANDARD*

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." [10] Fed. R.Civ.P. 56(c).

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case. A genuine issue of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" [11] *Thrifty Oil Co. v. Bank of America Nat'l Trust & Sav. Ass'n,* 310 F.3d 1188, 1194 (9th Cir.2002) (quoting *Union Sch. Dist. v. Smith,* 15 F.3d 1519, 1523 (9th Cir.1994)) (internal citations omitted). Conversely, where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

The moving party has the burden of persuading the Court as to the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The moving party may do so with affirmative evidence or by " 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. All evidence and reasonable inferences drawn therefrom are considered in the light most favorable to the nonmoving party. *See, e.g., T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987). So, too, the Court's role is not to make credibility assessments.

---

**10.** Affidavits made on personal knowledge and setting forth facts as would be admissible at trial are evidence. Fed.R.Civ.P. 56(e). Legal memoranda and oral argument are not evidence and do not create issues of fact. *See British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978).

**11.** Disputes as to immaterial issues of fact do "not preclude summary judgment." *Lynn v. Sheet Metal Workers' Int'l Ass'n,* 804 F.2d 1472, 1478 (9th Cir.1986).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. *Id.* at 250–51, 106 S.Ct. 2505.

Once the moving party satisfies its burden, however, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348; *California Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987). Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir.2002); *see also T.W. Elec. Serv.*, 809 F.2d at 630. The nonmoving party must instead set forth "significant probative evidence tending to support the complaint." *T.W. Elec. Serv.*, 809 F.2d at 630. Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### DISCUSSION

**I. Standard of Review of Benefits Denial**

The parties disagree as to what standard of review the Court should apply in deciding the motions for summary judgment and Plaintiff's motion to strike.

■ Challenges to an ERISA plan's denial of benefits is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115,

109 S.Ct. 948, 103 L.Ed.2d 80 (1989). When an insurance plan grants such discretion to the administrator of the plan, the reviewing court normally applies an "abuse of discretion" standard. *See Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1471 n. 2 (9th Cir.1994).

In this case, there is no dispute that UNUM has discretion to interpret the terms of the Plan, which provides, in relevant part: "When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." (U/A 204). However, Plaintiff argues that [1] UNUM's failure to timely comply with procedural requirements and [2] UNUM's conflict of interest, separately require the Court to review UNUM's denial of Plaintiff's claim for benefits *de novo* in deciding the instant motions.

**A. Whether appeal was "deemed denied" thereby requiring de novo review**

■ Plaintiff argues that UNUM's documented failure to meet regulatory and Plan deadlines for determining both his initial claim for benefits and his appeal of UNUM's denial of benefits, requires the Court to review Plaintiff's claim for benefits *de novo* in deciding the motion to strike and the summary judgment motions.

The Plan provides, in relevant part:

In the event that your claim is denied, either in full or in part, UNUM will notify you in writing within 90 days after your claim form was filed. Under special circumstances, UNUM is allowed an additional period of not more than 90 days (180 days in total) within which to notify you of its decision. If such an extension is required, you will receive a written notice from UNUM indicating

the reason for the delay and the date you may expect a final decision.

and

A final decision on the review [of an appealed denial] shall be made not later than 60 days following receipt of the written request for review. If special circumstances require an extension of time for processing, you will be notified of the reasons for the extension, and a decision shall be made not later than 120 days following receipt of the request for review.[12]

(U/A 233).

The applicable federal regulation additionally provides:

If notice of the denial of a claim is not furnished [within the 90–day period plus 90 more days in the case of special circumstances], *the claim shall be deemed denied and the claimant shall be permitted to proceed to the review stage* described in paragraph (g) of this section.

and

The decision on review shall be furnished to the claimant within the [60–day period plus 60 more days in the case of special circumstances]. *If the decision on review is not furnished within such time, the claim shall be deemed denied on review.*

29 C.F.R. § 2560.503–1(e)(2) and (h)(4)(2000) (emphasis added).[13]

In *Jebian v. Hewlett–Packard Co. Employee Benefits Org. Income Protection Plan,* 349 F.3d 1098 (9th Cir.2003), the claim administrator did not respond to the plaintiff's November 16, 1998 letter appealing the denial of benefits until March 15,

1999. *Id.* at 1103. At that time, one day before the 120–day appeal period was to expire, the claim administrator asked for certain medical records and left the appeal open indefinitely. *Id.* at 1104. The plan administrator formally denied the claim after the claimant filed suit in federal court. *Id.* at 1102. The court held that despite the claims administrator's letter and indication that further medical documents would be considered, the claim "was deemed denied on March 16," 120 days from the administrator's receipt of the appeal letter. *Id.*

The *Jebian* court reasoned that "when a decision is, under the Plan, necessarily the mechanical result of a time expiration rather than an exercise of discretion" courts should not defer to that decision. *Id.* at 1105. This is because "where, according to plan and regulatory language, a claim is 'deemed...denied' on review after the expiration of a given time period, there is no opportunity for the exercise of discretion and the denial is usually reviewed *de novo.*" *Id.* at 1103. However, 'inconsequential violations of the deadlines...would not entitle the claimant to *de novo* review...in the context of an ongoing, good faith exchange of information between the administrator and the claimant.' *Id.* at 1107 (quoting *Gilbertson v. Allied Signal, Inc.,* 328 F.3d 625, 631 (10th Cir.2003)). "Accordingly, while our holding regarding the appropriate standard of review on 'deemed denied' claims may be tempered in cases where a delinquent plan is nonetheless in substantial compliance with prescribed procedures, this is not such a case" *Id.*

---

**12.** The corresponding statutory language can be found at 29 C.F.R. § 2560.503–1(e)(3) and (h)(1)(i).

**13.** Plaintiff filed his claim for benefits in the year 2000. Thus, as in *Jebian,* the Court looks to the Code of Federal Regulations as of

2000. The year 2000 amendment of section 2560, deleting the "deemed denied" language, only applies to claims filed after January 1, 2002. *See Jebian v. Hewlett–Packard Co. Employee Benefits Org. Income Protection Plan,* 349 F.3d 1098, 1103 fn. 5 (9th Cir.2003)(citing 29 C.F.R. § 2560.503–1(h)(2002)).

In mid-January 2002, UNUM sent a letter to Plaintiff acknowledging receipt of his appeal and indicating the possibility of a decision past the initial 60 day period. (U/A 32 and 849).[14] The letter did not specify any extenuating circumstances for a possible late decision as required by the Plan. According to regulation and the terms of the Plan, UNUM's decision on Plaintiff's appeal was due by March 15, 2002 and if extenuating circumstances existed, by May 15, 2002. (U/A 233). UNUM denied Plaintiff's appeal on March 28, 2002, 13 days past the initial deadline. Throughout its briefs, Defendant suggests that the delay was due to Plaintiff's late submission of various documents. However, as detailed in the factual history above, Plaintiff did not submit any documents in support of his appeal after February 6, 2002. Defendant argues that a telephone message left by an UNUM representative on February 7, 2002 asking if Plaintiff intended to submit any more documentation, shows that UNUM was attempting to comply with the deadlines and to keep Plaintiff informed of its progress. (U/A 787).

Despite UNUM's failure to timely deny Plaintiff's appeal, there is no evidence that the denial of Plaintiff's claim was a "mechanical result" of the deadlines. Rather, this failure seems "inconsequential" given that UNUM and Plaintiff's attorney were in regular contact during the appeal process and that the appeal denial was issued well before the absolute 120–day period under the Plan.

Thus, the Court finds that UNUM "substantially complied" with procedural requirements and Plaintiff's claim was not "deemed denied." Therefore, *de novo* review is not warranted on the singular basis that UNUM failed to timely deny Plaintiff's appeal.

**B. *Whether UNUM has a conflict of interest warranting de novo review***

Plaintiff argues that the Court should review Plaintiff's claim for benefits *de novo* because UNUM's conflict of interest affected its administration of his claim.

The Ninth Circuit has held that the abuse of discretion standard of review may be "heightened" if a plan administrator has a conflict of interest. *Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1322 (9th Cir.1995). An apparent conflict of interest exists where the defendant is both the insurer and the administrator of the insurance policy. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 943 (9th Cir.1999). However, "the presence of a conflict does not automatically remove the deference ordinarily accord[ed] to ERISA administrators who are authorized by the plan to interpret a plan's provisions." *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794, 797 (9th Cir.1997).

14. In this part, the Court only evaluates Defendant's failure to timely deny Plaintiff's appeal because the regulation does not authorize *de novo* review by district courts for failure to timely deny *initial claims* for benefits. Rather, if a Plan administrator fails to timely deny an initial claim for benefits, the claim may be "deemed denied" and the claimant can obtain an automatic administrative review, or appeal, of the decision to deny benefits. *See* 29 C.F.R. § 2560.503–1(e)(2)(2000). Here, Plaintiff's initial claim received this type of administrative review upon Plaintiff's appeal of the denial. Thus, the Court need only address Defendant's failure to timely deny Plaintiff's appeal. The Court notes, however, that although failure to timely deny an initial claim for benefits will not alone warrant *de novo* review, such a failure may support finding that Defendant's apparent conflict of interest affected its decision-making in Plaintiff's case, and thereby warrant *de novo* review by the Court.

■ In order to obtain *de novo* review based on the Defendant's conflict of interest, the Plaintiff must "establish a serious conflict" by presenting "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary." *Atwood,* 45 F.3d at 1323. In deciding whether there was a conflict of interest, the Court can look outside the administrative record. *See Tremain v. Bell Industries, Inc.,* 196 F.3d 970, 977 (9th Cir.1999).

Case law suggests a number of factors that may constitute "material, probative evidence" of a serious conflict of interest:

[1] the plan administrator provides inconsistent reasons for its denial, *See Lang,* 125 F.3d at 799;

[2] the plan administrator relies on an improper disability definition in denying the claim for benefits. (*Tremain v. Bell Industries, Inc.,* 196 F.3d 970, 977 (9th Cir.1999));

[3] the plan administrator determines a material fact for which there is no supporting evidence, *See Id.;*

[4] the plan administrator fails to follow plan procedures. *See Friedrich,* 181 F.3d 1105, 1110 (9th Cir.1999);

[5] the plan administrator fails to provide requested information, *See Cherene v. First American Financial Corp. Long–Term Disability Plan,* 303 F.Supp.2d 1030, 1037 (N.D.Cal.2004);

[6] the plan administrator fails to provide a full and fair review of the claim and its denial, *See Friedrich,* 181 F.3d at 1110;

[7] Taken as a whole, the record suggests that the administrator acted as an adversary determined to deny the Plaintiff's claim for benefits. *See Id.*

■ Plaintiffs who present material, probative evidence of an actual conflict of interest will establish a rebuttable presumption that the conflict of interest affected the Plan administrator's decision to deny benefits. The burden will then shift to the Defendant to show that the conflict of interest did not affect the denial of benefits. *Bendixen,* 185 F.3d at 943 (citing *Atwood,* 45 F.3d at 1322). If Defendant cannot rebut the presumption, then *de novo* review is warranted.

■ Here, there is no question that an apparent conflict of interest exists because UNUM is both the insurer and administrator of Plaintiff's benefits. (UNUM Answer to First Amended Complaint at ¶ 8, p. 3, Exhibit 2).[15] Thus, the Court must determine whether Plaintiff has presented material, probative evidence establishing a serious conflict of interest and if so, whether UNUM can rebut the presumption by showing that the conflict did not affect their decision-making in Plaintiff's case.

### 1. Material, Probative Evidence of a Serious Conflict of Interest

Plaintiff sets forth the following as evidence of a serious conflict of interest affecting UNUM's decision-making in his case:

[1] UNUM's reasons for denying Plaintiff's initial claim in August and November 2001 are inconsistent with their reasons for denying his appeal in March 2002;

[2] UNUM is applying an improper definition of disability by classifying Plaintiff as a general practice physician rather

---

**15.** Further, according to Plaintiff, Genex, the company that performed Plaintiff's vocational assessment, is an UNUM subsidiary. *See* Plaintiff's Concise Statement in Opposition to Defendant's Motion for Summary Judgment, ¶ 13 (citing *Hangarter v. Paul Revere Life Insurance Co.,* 236 F.Supp.2d 1069 (N.D.Cal 2002)).

than as a urologist. (Thus, UNUM is ignoring the fact that one of the material and substantial duties of Plaintiff's actual occupation, urology, was to perform surgery, which he can no longer do). Moreover, this definition presumes that Plaintiff could actually practice as a general or family physician despite the fact that he has not done so for over 20 years;

■ UNUM has made several determinations that lack supporting evidence:

-although Plaintiff was not working at the time his claim was denied, there is no evidence that Plaintiff chose not to work, while there is evidence that Plaintiff sought and eventually obtained part-time employment;

-there is no evidence that Plaintiff can obtain employment as a non-surgical urologist; and

-there is no evidence that Plaintiff could make 80% of his previous income as a general or family practitioner;

■ UNUM did not provide Plaintiff with sufficient notice of his right to appeal the denial when they denied his initial claim in August 2001. Plaintiff received the notice of his right to appeal in November 2001. UNUM also failed to meet deadlines for denying Plaintiff's initial claim for benefits and his appeal of that denial; and

■ UNUM failed to provide the surveillance videotape to Plaintiff. Thus, UNUM did not conduct a full and fair review of Plaintiff's claim because Plaintiff did not have an opportunity to respond to it during the administrative process. Moreover, UNUM acted like an adversary by withholding the videotape despite repeated requests for it.

### a. *Inconsistent Reasons for Denial*

The Court does not find any glaring inconsistencies between UNUM's initial denial and the denial of his appeal that are probative of a conflict of interest. To the contrary, and as more thoroughly discussed, infra, the Court finds UNUM's repeated reliance on the same, purely quantitative, and therefore faulty, analysis of Plaintiff's ability to work, i.e., that Plaintiff can work as a part-time, non-surgical urologist because only 20% of urology involves surgery, to be greater evidence of a conflict of interest.

According to the Plan,

MATERIAL AND SUBSTANTIAL DUTIES means duties that:

-are normally required for the performance of your regular occupation; and

-cannot be reasonably omitted or modified.

(U/A 209). Thus, this reasoning lacks support in the administrative record and directly conflicts with Dr. Yarbrough's letter regarding the surgical nature of urology practice, the DOT definition of "urologist," and the Genex survey, indicating that all urologists are expected to perform some surgery regardless of how many hours they work.

### b. *Improper Disability Definition*

As will be discussed more fully below, the Court finds that Defendant applied an improper disability definition in processing Plaintiff's claim by finding that Plaintiff's "regular occupation" is "general practice physician" rather than "urologist." The Court discusses this error in connection with the merits of the parties' respective summary judgment motions. However, in short, UNUM's interpretation of Plaintiff's "regular occupation" finds no support in the relevant case law and ignores clear evidence in the record indicating that Plaintiff's actual, usual duties as a urologist are at issue for purposes of determining whether he is disabled under the Plan.

#### c. *Factual Determinations Lacking Supporting Evidence*

Plaintiff has submitted evidence showing that on or about September 25, 2001, prior to UNUM's final denial of his initial claim for benefits, Plaintiff attempted to obtain part-time employment at KMC. In early April 2002, just after Defendant denied Plaintiff's appeal, Plaintiff's attorney informed UNUM that Plaintiff had begun working part-time at another medical clinic. Thus, other than the fact that Plaintiff was not working during the time his claim for benefits was being processed, there is no evidence that Plaintiff chose not to seek employment.

As mentioned, and as will be discussed fully in connection with the merits of the parties' summary judgment motions, the Court agrees with Plaintiff that UNUM determined the material fact that Plaintiff could practice non-surgical urology without supporting evidence showing that non-surgical urology positions even exist.

UNUM's November 8, 2001 letter to Plaintiff's attorney indicates that Plaintiff could make 80% (the amount that will warrant denying benefits) of his previous income as a family or general practitioner. Yet, the Genex survey conducted for UNUM clearly indicates that if Plaintiff could find employment as a general practitioner he would only make between 41% and 62% of his previous income.

UNUM also relied on a website, "salary.com," in finding that Plaintiff could make between 79% and 82% of his previous income as a family practice physician in Hawaii or Los Angeles, respectively. However, as Plaintiff notes, UNUM compared the "salary.com" figures for family practice physician with Plaintiff's actual previous income. (Plaintiff's Opposition to Defendant's Motion for Summary Judgment, n. 7). If UNUM had empared the "salary.com" average salaries for family practice physician in Hawaii with the "sal-

ary.com" average salary for urologists in Hawaii it would have found that family practice physicians only make 62% of urologists' salaries. The fact that UNUM relied on such arbitrary and incomparable figures while ignoring traditionally-relied upon and consistent data indicating that Plaintiff could not make 80% of his previous salary, suggests that UNUM conducted itself as an adversary determined to deny Plaintiff's claim.

#### d. *Failure to Follow Plan Procedures*

Although the Court did not find that UNUM's failure to comply with procedural and language requirements, by itself, warranted *de novo* review under the "deemed denied" rationale, the Court does find that UNUM nevertheless failed to follow plan procedures.

#### e. *Failure to Provide Requested Information*

UNUM's failure to release the video upon Plaintiff's request is evidence of a conflict of interest. As discussed more fully in the next part, UNUM relied on this video in making its determination of Plaintiff's claim, it did not withhold any other documents from Plaintiff, Plaintiff felt compelled to file a complaint with the Department of Labor regarding the withholding, and it appears that Plaintiff did not obtain the video until *NEF* was ordered to produce it by Magistrate Judge Chang. Plaintiff's inability to submit a response to the video during the administrative process means that UNUM did not conduct a "full and fair review" of the administrative record.

Viewed all together, the evidence cited by Plaintiff indicates that UNUM acted like an adversary determined to deny Plaintiff's claim during the administrative process. Thus, the Court finds that Plaintiff has presented material, probative

evidence establishing a rebuttable presumption that UNUM's conflict of interest affected its decision to deny Plaintiff benefits.

### 2. *Rebuttable presumption of conflict of interest*

Because Plaintiff has met his initial burden of producing evidence from which it could be inferred that the plan administrator's decision was affected by UNUM's conflict of interest, the burden shifts to UNUM to show that its decision accorded with its fiduciary duties.

To rebut the presumption of a conflict of interest, UNUM provides the following:

■ UNUM thoroughly explained the basis of its denial to Plaintiff;

■ UNUM's decision does not conflict with the plain language of the policy;

■ UNUM's decision is not based on any clearly erroneous findings of fact because all involved agree that Plaintiff's medical practice was only 20% surgical; and

■ UNUM was within its legal rights to withhold the video from Plaintiff, as the governing regulation is "ambiguous" with respect to what documents must be disclosed to a claimant.

Plaintiff has not argued that UNUM failed to explain the basis of its denial of benefits, only that the explanations were inconsistent. Thus, this evidence does not rebut the presumption of a conflict.

As mentioned and as discussed more thoroughly in the next part, the Court finds that UNUM did ignore the plain language of the Plan by classifying Plaintiff as a general practice physician rather than as a urologist. Plaintiff has also argued that UNUM determined that he could obtain employment as a non-surgical urologist and make 80% of his previous income as a general practice physician without supporting evidence and despite documentation in the record to the con-

trary. UNUM has not responded to these points in arguing against *de novo* review and therefore fails to rebut the presumption of a conflict of interest that this evidence establishes.

As will be discussed more fully in the next part, case law has interpreted "pertinent" documents as those the plan administrator relied on in making its decision to deny a claim for benefits. The Court finds that Defendant relied on the surveillance video in making its decision to deny Plaintiff's claim for benefits and thus the video is "pertinent" and should have been provided to Plaintiff. Moreover, UNUM's failure to timely release the video with the rest of the administrative record nor upon Plaintiff's request suggests that UNUM was acting like an adversary rather than a fiduciary. UNUM has not presented any evidence to rebut this presumption.

### *Conclusion on Standard of Review*

The Court finds that Plaintiff has presented sufficient material and probative evidence to create a rebuttable presumption that UNUM's decision to deny benefits was affected by its conflict of interest. UNUM has not presented sufficient evidence to rebut this presumption. Therefore, UNUM's decision to deny Plaintiff benefits is reviewable *de novo*.

### II. *Plaintiff's Motion to Strike Surveillance Video from Administrative Record, or to Supplement Record with Treating Physician Declaration*

Plaintiff moves to strike the surveillance video (U/A 1257) from the administrative record that the Court will be reviewing *de novo* to decide the motions for summary judgment. The video contains three (3) days of surveillance of Dr. Raithaus in which he can be seen bending, bicycling, lifting bicycles into his vehicle, swimming,

diving under waves, and body surfing in significant wave action, and pulling his young son on a boogie board through water and on sand. Plaintiff argues that because UNUM failed to provide the video to Plaintiff during the administrative process he did not have a proper opportunity to respond to it, and therefore UNUM could not conduct a "*full and fair review.*" UNUM contends that the law only required the release of "pertinent" documents and that the surveillance video was not "pertinent" because they only relied on the surveillance report in deciding Plaintiff's claim. The surveillance report was provided to the Plaintiff. UNUM also argues that Plaintiff's motion should be denied because Plaintiff has not indicated how the surveillance report differs from the video.

Plaintiff argues in the alternative that if the Court is inclined to allow the video to remain part of the administrative record, then he should be allowed to supplement the record with new evidence that responds to the video. To that end, he would like to submit the declaration of Dr. Gilbert Hager, who has watched the video and declares, in part, that:

> In my professional opinion, there is nothing seen on this video that constitutes infraction of the medical recommendations given to Dr. Raithaus.... He has been advised to swim and certainly playing in the calm ocean should not be considered overly strenuous.... it is clear that he is not straining or pulling hard.... Dr. Raithaus' ability to pull his son on a boogie board across the water is not at all inconsistent with my diagnosis and treatment of him, nor does it exceed the restrictions I have given him for recreational activities.

(Plaintiff's Motion to Strike, Ex. 1). Dr. Hager's declaration also reiterates that Plaintiff is "unable to return to full-time work as an operating urologist or in any job that is not purely sedentary." *Id.* UNUM challenges the proffered declaration, arguing that Dr. Hager is not a credible witness.

Finally, in his Reply, Plaintiff requests that the Court issue an order to show cause why UNUM should not be sanctioned under Rule 11. Plaintiff contends that Defendant acted in bad faith by arguing in its Opposition that the video was not "pertinent" while relying on the video in moving for summary judgment.

### A. *Whether to strike the surveillance video*

In considering a motion for summary judgment, a court may only consider evidence that would be admissible in evidence at trial. *See* Fed.R.Civ.P. 56(e).

 The Court is not aware of, and neither Plaintiff nor Defendant have cited any, statutory or case law regarding the Court's authority to "strike" a document from the administrative record. Given that the surveillance video would be admissible at trial, the Court finds that there is no basis for striking the surveillance video from the administrative record, and to that extent Plaintiff's motion to strike is DENIED.

### B. *Whether to supplement the record*

"[A]n abuse of discretion standard of review limits the Court to consider only evidence in the administrative record at the time the decision was made." *McKenzie*, 41 F.3d 1310, 1316 (9th Cir.1994); *Taft*, 9 F.3d 1469, 1471 (9th Cir.1993). However, as discussed, the Court finds that the proper standard of review in this case is *de novo*. Therefore, the Court has discretion whether or not to allow Dr. Hager's declaration into the record. *See Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943–44 (9th Cir.1995) (adopting "a scope of

review that permits the district court *in its discretion* to allow evidence that was not before the plan administrator. The district court should exercise its discretion, however, only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision")(emphasis in the original).

In order to ensure that plan administrators perform a "full and fair review" of a claim for benefits, claimants appealing a denial of benefits are authorized to: [i] request a review upon written application to the plan; [ii] review pertinent documents; and [iii] submit issues and comments in writing. 29 C.F.R. § 2560.503–1(g)(1)(2000).

■ "Under 29 C.F.R. § 2560.503–1(g)(1), an ERISA plan must allow a claimant to '[r]eview pertinent documents' and '[s]ubmit issues and comments in writing.' *Id.* This requirement means that a benefit plan must 'provide claimants with access to evidence the decision-maker relied upon in denying their claim.'" *Regula v. Delta Family–Care Disability Survivorship Plan,* 266 F.3d 1130, 1155 (9th Cir.2001) (citing *Wilczynski v. Lumbermens Mut. Cas. Co.,* 93 F.3d 397, 402 (7th Cir.1996)(abrogated on another issue by *Black and Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003))). "A benefit plan does not need to allow a claimant to review every document in his administrative file, but only those documents that are influential in the plan's decision." *Id.* In *Regula,* the court held that the plan did not deny the claimant "a full and fair review" because the claimant "was able to examine and comment upon all the information that formed the basis for the denial of his claim." *Regula,* 266 F.3d at 1155.

■ UNUM contends that by providing Plaintiff with the surveillance report, it has fulfilled its obligations under the law as Plaintiff cannot show that UNUM relied on the videotape as opposed to the report in deciding to deny Plaintiff's claim for benefits or that the report misrepresents what is shown on the video. In support, UNUM cites to *Russell v. Paul Revere Life Ins. Co.,* 148 F.Supp.2d 392 (D.Del. 2001) wherein the claim administrator similarly failed to produce surveillance videos to the claimant. Although "ideally, Paul Revere should have allowed Russell to view the videotapes...prior to filing his claim" the court found that various letters and a telephone conversation with the claimant conveying information in the surveillance videos "substantially complies with § 2560.503–1(g)(1)(ii)." *Id.* at 411.

The Court notes that despite some of the factual similarities between the *Russell* case and this one, the *Russell* court applied a "modified or 'heightened' arbitrary and capricious standard of review" rather than *de novo* review. *Id.* at 402. Also, in *Russell* Plaintiff moved for summary judgment based on the withholding of the video whereas here Plaintiff is only moving to strike the video or supplement the record based on the withholding.

Plaintiff argues that the surveillance video is clearly "pertinent" to UNUM's decision to deny benefits because: [1] Annie Hong, "the duly authorized custodian of the Administrative Record relating to Lawrence R. Raithaus, M.D." has declared under penalty of perjury that "[a]n Administrative Record is a compilation of all of the evidence and arguments that were before the plan administrator when he or she made his or her decision as to a claim for benefits" and "documents bates-numbered U/A 0001 through U/A 1256 and a videotape identified as U/A 1257—is a true and correct copy of UNUM's Administrative Record relating to Lawrence R. Raithaus, M.D." Hong Decl., April 14, 2004, attached to Ex. A in Support of Defendant's Motion

for Summary Judgment; [2] UNUM repeatedly referenced the video (as opposed to the report) in explaining its reasons for denying Plaintiff's claim; [3] UNUM did not make an effort to withhold other allegedly non-pertinent documents, rather the video is the only document in the administrative record that was withheld from the Plaintiff; and [4] Defendant did not release the video with the rest of the administrative record, nor upon Plaintiff's request, forcing the Plaintiff to complain to the Department of Labor.

The Court agrees with Plaintiff and finds that the surveillance video was pertinent to UNUM's decision to deny Plaintiff's claim for benefits. A picture is worth a thousand words, especially given that the video shows Plaintiff performing strenuous back movements and body surfing in significant wave action, which are detrimental to Plaintiff's claim. Indeed, it would be unreasonable for UNUM *not* to rely on the video in making its determination of Plaintiff's claim. Moreover, although the surveillance report does not blatantly contradict what is shown in the video, the report clearly represents Defendant's interpretation of what can be seen in the video and Plaintiff should have been provided an opportunity to submit his own interpretation to the administrative record during the time his claim for benefits was being processed. Finally, the custodian of the administrative record has declared under penalty of perjury that the video was before the plan administrator when the decision to deny Plaintiff's benefits was made.

██ Upon a *de novo* review of Plaintiff's claim for benefits, the Court has discretion to supplement the administrative record with any documents that will assist in its review. The Court finds that a "full and fair review" of the administrative record should include a review of any documents submitted in response to the surveillance video. Given that Plaintiff did not have an opportunity to view and respond to the video during the administrative process, the Court finds it appropriate to supplement the administrative record with Dr. Hager's declaration that responds to the video.

### C. *Whether to Sanction UNUM*

In his Reply, Plaintiff has asked the Court to issue an order to show cause why Defendant should not be sanctioned for arguing that the surveillance video is not "pertinent" while at the same time relying on it in moving for summary judgment.

A motion under Rule 11 must be made separately from other motions, and shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or corrected. *See* Fed.R.Civ.P. 11(c)(1)(A).

██ In this case, Plaintiff has not properly moved for sanctions under Rule 11 as there is no indication that Plaintiff first served Defendant with the motion 21 days prior to filing its Reply containing this request. And although the Court finds that the surveillance video was pertinent to UNUM's decision to deny Plaintiff's claim, the Court does not find that Defendant's representations to the Court violate Rule 11. *See* Fed.R.Civ.P. 11(b). Thus, the Court declines to order sanctions on its own initiative. *See* Fed.R.Civ.P. 11(c)(1)(B).

### *Conclusion on Plaintiff's Motion to Strike*

The Court will not strike the videotape, U/A 1257, from the administrative record. Dr. Hager's declaration (Exhibit 1 to Plaintiff's Motion to Strike) will be added to the administrative record. The Court will not order Rule 11 sanctions against

Defendant as Plaintiff has not properly moved for them and they do not seem appropriate under the circumstances of this case.

### III. *Motions for Summary Judgment*

The Court may only decide the case by summary judgment if under a *de novo* standard of review of Plaintiff's claim for benefits, there are no material issues of genuine fact. *See Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1090 (9th Cir.1999) (en banc).

### A. *Plaintiff's "regular occupation" under the Plan*

▮ Defendant argues that Plaintiff's "regular occupation" under the Plan is "general practice physician" rather than urologist because at issue is a *group,* rather than individual, insurance policy under which Plaintiff is categorized as a "Physician" and not under any specialty. Defendant contends that Plaintiff is inappropriately "importing a specialty definition" into the provisions of his group policy from UNUM and confusing the specialty coverage from his individual policy from NEF with the less specific coverage he is owed under the UNUM group policy. However, applying a *de novo* review to Plaintiff's claim for benefits, the Court finds that Defendant applied an improper disability definition in Plaintiff's case. The Court finds, as a matter of law, that Plaintiff's "regular occupation" under the Plan is "urologist."

▮ When applying a *de novo* review to a claim for benefits, the Court "may construe the Plan in accordance with the rules normally applied to insurance policies". Courts in the Ninth Circuit "interpret terms in ERISA insurance policies 'in an ordinary and popular sense as would a [person] of ordinary intelligence and experience'." *Evans v. Safeco Life Ins. Co.,* 916 F.2d 1437, 1441 (9th Cir.1990) (citation

omitted). Ambiguities in ordinary insurance contracts are construed against the insurance company.... The rule, known as the doctrine of *contra proferentem,* requires us to adopt the reasonable interpretation advanced by [Plaintiff]." *Lang,* 125 F.3d at 799 (acknowledging that ambiguities would be resolved in favor of the *insurer* if there was no conflict of interest and thus the insurer was entitled to deference by the Court). Moreover, "federal common law under ERISA [provides] that 'courts will protect the reasonable expectations of ... insureds ... even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer'." *McClure v. Life Ins. Co. of North America,* 84 F.3d 1129, 1135 (9th Cir.1996) (citation omitted). *See also Lasser,* 344 F.3d at 386 ("The plain meaning of 'regular occupation' is one of which both parties were aware when the Policy began.... There is no reason to believe that Dr. Lasser was aware of [Defendant's] different definition until it denied him benefits...."). Finally, "[a]n agreed interpretation of the clause at issue by the parties, especially before the controversy arises, is an important aid in the interpretation of alleged uncertain terms.... A prior construction given by the insurance company itself 'must be considered as very persuasive'." *Oglesby v. Penn Mutual Life Ins. Co.,* 877 F.Supp. 872, 882 (D.Del.1994) (applying Delaware state law) (citations omitted), *quoted in Gross v. UnumProvident Life Ins. Co.,* 319 F.Supp.2d 1129, 1143–44 (C.D.Cal.2004) (applying California state law).

The Plan in this case provides, in relevant part:

> You are disabled when UNUM determines that:
>
> -you are limited from performing the material and substantial duties of your

regular occupation due to your sickness or injury; and

-you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury....

REGULAR OCCUPATION means the occupation you are routinely performing when your disability begins.

(U/A 209).

First, the Court finds that the policy terms defining "regular occupation" are clear on their face. In the plain meaning of the policy's terms, "regular occupation" is explained as one's routine work when disability begins; an insured is disabled when one cannot do the material and substantial duties of the insured's routine work (and also experiences at least a 20% loss in income due to the disability). Therefore, if Plaintiff's routine work at the time of his injury was that of a urologist and not a general or family practice physician, and he could no longer perform the material and substantial duties of his urology practice, he would be entitled to long-term disability benefits. No provisions in the Plan indicate that all physicians would be treated as having the same "regular occupation." Moreover, the fact that "regular occupation" is modified by the qualifying term "your" indicates that the focus should be on the Plaintiff's particular medical practice rather than a broader, categorical "physician" standard.

Even if the Court initially found that the contract language is ambiguous, the evidence in the administrative record indicates that there are no genuine issues of fact that Plaintiff's "regular occupation" is "urologist."[16]

The administrative record contains UNUM's 1995 letter to KMC stating:

Even if a contract does not have a specialty definition, a surgeon can still re-

ceive benefits if they are now performing the duties of a general practitioner, this is because we pay benefits not based on the title of an occupation but on the material duties of an occupation....

We consider a heart surgeon and a general practitioner to be separate occupations and the salary and the job duties are also different. *The specialty definition would not make a difference in this case.*

(U/A 1046–47)(emphasis added). By analogy, even though the policy at issue here may not have a specialty definition, Plaintiff, should still receive benefits if it is proven that he cannot perform a material and substantial duty of the occupation he was performing at the time of his allegedly disabling injury (and cannot otherwise earn 80% of his previous income). Moreover, Defendant has acknowledged that if benefits were to be paid to Plaintiff, the amount of such benefits would be calculated based on Plaintiff's income as a urologist, which is approximately $100,000 more than the average salary for a general or family practice physician in Hawaii. That the benefit amount would be based on Plaintiff's work as a urologist rather than as a general or family practice physician, further supports finding that Plaintiff's "regular occupation" is "urologist."

While Defense counsel's argument that "regular occupation" in a group policy should be interpreted generally while "regular occupation" in an individual policy should be interpreted to cover Plaintiff in his specific medical practice of urology, seems reasonable, the record evidence and case law indicate that such a distinction should not be made. Although Defense counsel asserted that NEF's policy had specialty language the record evidence suggests that Plaintiff's individual policy

---

**16.** The Court recognizes the basic tenet of contract law that parol evidence may only be considered if the contract terms are ambiguous.

from NEF contained exactly the same language as Plaintiff's group policy from UNUM. Presumably, the reason why NEF stated Plaintiff's "current occupation [is] specialist in the field of urological surgery" in its 1996 letter is because Plaintiff indicated as much in his application for insurance coverage from NEF. (U/A 28). Similarly, during the same period of time as his applications for insurance coverage were made, Plaintiff wrote that his "current position" was "Urologic Surgeon" in his application for employment with KMC. (U/A 367).

Further, Plaintiff's original Complaint in the NEF case alleged that the NEF policy had a specialty definition, but the First Amended Complaint clarified that the NEF policy would provide benefits if Plaintiff could not perform the 'important duties' of 'the occupation or occupations in which [Plaintiff was] regularly engaged at the time Disability begins.' (*Lawrence R. Raithaus, M.D. v. New England Mutual Life Insurance Company*, CV 02–100, U.S.D.C. District of Hawaii, Gillmor, J., *compare* Complaint and First Amended Complaint, ¶ 7). Except for the NEF letter to Plaintiff explicitly stating that he was covered as a urological surgeon, there is no evidence in the record or among the briefs on the instant motions that the NEF policy had a specialty definition categorizing Plaintiff as a "urologist" or "urological surgeon." [17]

Thus, even if UNUM intended the group policy to cover Plaintiff as a general practice physician, Plaintiff's expectation that he would be covered as a urologist was reasonable and will therefore be honored by the Court. *See McClure* and *Lasser*, 344 F.3d at 386, supra.

Case law does not support the distinction Defendant is attempting to make between individual and group policies. Rather, the relevant case law clearly supports finding, as a matter of law, that under a group policy, Plaintiff's "regular occupation" is the specific type of medical practice in which he was engaged at the time he was injured, in this case, urology. The following ERISA, group-policy cases involving physician-claimants (and one nurse) exemplify the appropriate interpretation of "regular occupation":

*Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 385–86 (3rd Cir.2003) *See also Lasser v. Reliance Standard Life Ins. Co.*, 146 F.Supp.2d 619 (D.N.J. 2001): Under a policy categorizing claimants as "Physicians and Administrators," the court held "that 'regular occupation' is not ambiguous" and "[a]pplying the text as written, Dr. Lasser's regular occupation was as an orthopedic surgeon responsible for emergency surgery and on-call duties in a relatively small practice group and within a reasonable travel distance from his home in New Jersey."

*Freling v. Reliance Standard Life Ins. Co.*, 315 F.Supp.2d 1277 (S.D.Fl.2004): In analyzing Plaintiff's claim for benefits under "a 'Regular Occupation' disability insurance policy . . . for the benefit of Tenet's physician employees," the court identified Plaintiff's "regular occupation" as "an OB/GYN physician" without dispute by either party.

*Dionida v. Reliance Standard Life Ins. Co.*, 50 F.Supp.2d 934, 941 (N.D.Cal. 1999): Defendant argued that Plaintiff's "regular occupation" was "registered

---

17. The Court notes that the 1995 letter from UNUM to KMC addressed the effect of its coverage for each doctor at KMC and therefore illustrated the "regular occupation" provision through a general example involving a heart surgeon. By contrast, the 1996 NEF letter was addressed specifically to Plaintiff, indicating why it specified that Plaintiff's "occupation" would be regarded as urological surgeon.

nurse" which included eight (8) different occupations for which Plaintiff was arguably still qualified. However, the court held that Plaintiff's "regular occupation" was the more specific "Nurse, General Duty" and "the D.O.T. ratings do not provide any rationale for deeming *any* of the other occupations in the Registered Nurse occupational group to be the same occupation as 'Nurse, General Duty'." (emphasis in the original).

There is no dispute that Plaintiff was working as a urologist at the time of his injury (in fact he was performing a urological surgical procedure at the precise moment of his injury). Thus, case law supports Plaintiff's argument that his "regular occupation" under the Plan is "urologist" and not "general practice physician."

Finally, in addition to the 1995 letter, other case-specific facts support finding, as a matter of law, that Plaintiff's "regular occupation" is "urologist": [1] Defendant "admitted that Plaintiff was working as a Urologist at the Kauai Medical Clinic." (UNUM Answer to First Amended Complaint, ¶¶ 17, 21, p. 5); [2] UNUM indicated that Plaintiff's occupation was "urological surgeon" when it requested the GENEX labor market survey. (U/A 999); [3] UNUM's own consultants, doctors, and case "specialists" repeatedly refer to Plaintiff as an "urologist." *See* U/A 12, 35, 115 ("claimant is a 58 year old right hand dominant male 'Urologist' . . ."); U/A 178 ("56 yo male Urological Surgeon who last worked on 8/31/00 due to work related injury"); and [4] Each of the IME doctors have described Plaintiff as a "urologist." *See* U/A 794 (Dr. Cupo indicated Plaintiff was a "physician/urologist"); U/A 1004 (Dr. Lin described Plaintiff as "a 57 year old right hand dominant Urologist."); U/A 804 (Dr. Endicott stated Plaintiff "is a 58–year–old right-handed male medical doctor who was practicing as an urologist at the time of injury").

For the foregoing reasons, the Court finds, as a matter of law, that Plaintiff's "regular occupation" under the Plan is "urologist."

### B. *Whether surgery constituted a "material and substantial duty" of Plaintiff's "regular occupation"*

■ At the hearing, during rebuttal, defense counsel stated: "We're not claiming that he can perform surgery . . . . That's not the basis of our . . . argument here." *See* June 14, 2004 hearing transcript, at 30:8–10. Rather, defense counsel argued that surgery was not a substantial part of Plaintiff's duties when he was injured. For the following reasons, the Court finds, as a matter of law, that surgery is a "material and substantial duty" of Plaintiff's "regular occupation" as a urologist. MATERIAL AND SUBSTANTIAL DUTIES means duties that:
-are normally required for the performance of your regular occupation; and
-cannot be reasonably omitted or modified. (U/A 209).

In arguing that surgery was not a "material and substantial duty" of Plaintiff's "regular occupation," defense counsel has inappropriately focused on the quantitative aspects of Plaintiff's urology practice, wherein surgery provided between one-fifth and one-third of Plaintiff's billing income prior to his injury. *See* U/A 1174 (UNUM Field Representative report indicating that "80 percent of Dr. Raithaus' duties consisted of treating patients in the clinic and conducting hospital consultations" while "[t]he other 20 percent of Dr. Raithaus' duties involved the performance of surgery"); U/A 945–46 (NEF finding that surgery constituted approximately 32% of Plaintiff's billing in 1999 and 2000).

Contrary to Defendant's quantitative argument, the plain language of the Plan's provision addressing "material and substantial duties" actually requires a *qualita-*

*tive* inquiry into Plaintiff's duties in his "regular occupation." In other words, what were the duties Plaintiff was expected to perform as a urologist? And, could Plaintiff work as a urologist without performing any of these duties?

In this case, the record evidence indicates that urologists are expected to perform some surgery and one cannot be a urologist unless one can perform some surgery. *See* U/A 993, 989 (GENEX survey providing: in Hawaii "Over sixty employers were contacted across Urology and Fertility Clinics that provided similar responses indicating non-surgical urological positions did not exist," and in Los Angeles, "[a]ll reported that the position of Urologist, non-surgical did not exist."); U/A 3 (Dr. Yarbrough's letter indicating that "urology is both a medical specialty and a surgical specialty.... When a patient is referred to a urologist, it is the expectation of the referring physician and patient that all necessary medical and surgical urologic care will be provided by the urologist."); and U/A 82 (Plaintiff's C.V.

indicating that he has completed both surgical and urological residency programs).[18] There is no evidence in the record that non-surgery urology positions exist. Thus, Dr. Lin's opinion that Plaintiff is physically capable of working in an "office-based urology practice" does not create a genuine issue of fact as to whether non-surgical urological positions even exist, especially given that Dr. Lin is not himself a urologist.[19]

For the foregoing reasons, the Court finds that all urologists are "normally required" to perform surgery and that the duty to perform surgery "cannot be reasonably omitted or modified" from the practice of urology. Thus, the Court holds, as a matter of law, that surgery constitutes a "material and substantial duty" of Plaintiff's "regular occupation" as a urologist.

### C. Whether Plaintiff is "disabled" under the Plan

■ The Court finds that there *are* genuine issues of material fact as to

---

18. Even the Department of Labor's Dictionary of Occupational Titles ("DOT") states that urologists "Perform surgery, as indicated". (U/A 81). The DOT job definitions are commonly used by plan administrators. *See Winters v. UNUM Life Ins. Co. of America*, 232 F.Supp.2d 918, 932 (W.D.Wis.2002) ("definitions of light work found in the Dictionary of Occupation Titles and Code of Federal Regulations, which are considered synonyms..."); *Dionida v. Reliance Standard Life Ins. Co.*, 50 F.Supp.2d 934, 940, n. 4 (N.D.Cal.1999) ( "The D.O.T. is the result of over fifty years of occupational data collection and evaluation for the very purpose of defining specific 'occupations.' ... Given the amount of research and analysis that has gone into grouping similar jobs and defining the occupational titles, and the length of time the D.O.T. has been widely used, it is reasonable for plan administrators, and courts, to use it for determining a claimant's 'regular occupation'."). *But see Lasser v. Reliance Standard Life Ins. Co.*, 146 F.Supp.2d 619, 633 (D.N.J.2001) (Defendant's witness "testified that the DOT was a main-

stay of the long-term disability insurance industry...This Court is not the only tribunal to find this authority lacking.") (citations omitted).

*See also Dictionary of Occupational Titles,* "Parts of the Occupational Definition," *available at* www.occupationalinfo.org/front_223.html(2004) ("Many definitions contain one or more sentences beginning with the word 'May'. They describe duties required of workers in this occupation in some establishments but not in others"). The Court notes that the DOT definition for urologist does not preface the duty of surgery with a modifying "may," indicating that it is required of all urologists.

19. As discussed in the next part, Dr. Lin's opinion *does* create an issue of fact as to whether Plaintiff is physically unable to work as a urologist, including whether he can continue working as a urologist by modifying how he performs his occupational duties to account for his physical limitations.

whether Plaintiff can satisfy each prong of the Plan's disability definition in order to obtain benefits.

The Plan provides, in relevant part:

You are disabled when UNUM determines that:

-you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and

-you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

(U/A 209).

### 1. *Plaintiff's evidence of disability*

The following evidence in the administrative record supports Plaintiff's argument that he is "disabled" under the provisions of the Plan:

Doctors Cupo, Hager, Endicott, and Gritton (an UNUM in-house doctor) have all opined that Plaintiff cannot perform surgery.[20] Moreover, just before denying Plaintiff's appeal, UNUM's own Carolyn Brooks indicated in writing that UNUM's medical department had "agreed that Dr. Raithaus is unable to perform surgeries." (U/A 1064–66).

As to whether Plaintiff has experienced a 20% or more loss in his monthly earnings as a result of his injury: both the Genex and Forsloff labor market surveys indicate that Plaintiff could not make 80% of his previous income practicing in a non-surgi-

cal capacity. Plaintiff is currently working part-time in a sedentary and non-surgical position and only making 9% of his previous monthly income. It would be unreasonable to expect Plaintiff, who has practiced as a urologist for over 20 years, to retrain as a family practitioner as would be necessary for him to begin such a practice at this late stage in his career.

### 2. *Defendant's evidence of no disability*

Defendant's argument that Plaintiff is not "disabled" under the provisions of the Plan is supported by the following evidence in the record:

As noted by more than one of the examining doctors, "very little change" can be detected in the MRI images of Plaintiff's back that were taken before and after the allegedly disabling injury.

Dr. Cupo noted that there was no objective evidence of new structural damage after Plaintiff's August 2000 injury. Moreover, Dr. Cupo stated that Plaintiff was not permanently injured, would recover from the August 2000 incident, and recommended he return to work. Dr. Cupo also pointed out that the relevant symptoms had been self-reported by Plaintiff (a doctor ostensibly knowledgeable about which symptoms merit particular diagnoses) and were subjective in nature. Finally, Dr. Cupo advised Plaintiff not to lift objects heavier than 10 pounds, but in the surveillance video Plaintiff can be seen lifting his bicycle into his car and pulling his son on a boogie board over the sand, both of which seem to weigh more than 10 pounds.[21] Dr.

---

**20.** It appears that Dr. Gritton did not personally examine Plaintiff, rather Dr. Gritton's opinion is based on the examining physicians' reports: "Claimant has multiple physicians who feel he can't return to operative urology practice, I am in agreement with this." (U/A 117).

**21.** Additionally, Dr. Hager's declaration responding to the surveillance video seems to misstate the nature of Plaintiff's activities. In the video, Plaintiff can be seen swimming, diving under waves, and body surfing in rather significant wave action whereas Dr. Hager only stated that swimming in the calm ocean is consistent with his recommendations for Plaintiff's treatment and recovery. Plaintiff

Lin opined that Plaintiff may be magnifying his symptoms. Dr. Lin never states that Plaintiff cannot perform surgery.

Both doctors also indicate the possibility of Plaintiff participating in a "modified" surgical urology practice. Dr. Lin described how prior to the injury at issue Plaintiff tailored his approach to surgical procedures to accommodate his back limitations, and both Dr. Lin and Dr. Cupo indicated that Plaintiff could return to work and engage in similar precautions.[22]

In the surveillance video, Plaintiff can be seen participating in a variety of strenuous physical activities.

Thus, Defendant can reasonably argue that based on the MRI images, the doctors' assessments, and the surveillance video, Plaintiff is in the same physical condition as he was prior to the injury at issue and that Plaintiff's life has continued to be "unaffected" by his back problems. Plaintiff is at least physically able to work in his regular occupation with a "modified" work schedule wherein he is not the only urologist on-call, he conducts fewer surgical procedures per day, and he takes breaks and stretches during longer procedures.

Of significance, it appears that *none* of the doctors who conducted an independent medical evaluation of Plaintiff, including those that had concluded that Plaintiff could no longer perform surgery, had an opportunity to view the surveillance video of Plaintiff before issuing their opinions. As discussed, the surveillance video shows Plaintiff participating in a variety of strenuous activities that seem inconsistent with the various doctors' opinions regarding Plaintiff's physical limitations.

The timing of Plaintiff's allegedly disabling injury is suspicious as it coincided al-

---

can also be seen pulling his son on a boogie board through water and over sand and Dr. Hager only stated that pulling a board through water is consistent with his recommendations.

**22.** Dr. Lin stated:

He reports that 'once or twice a week' after performing 'extended procedures' in the operating room, he would experience transient exacerbations in his low back pain that could be managed with ibuprofen and local heat. Typically by the following day, he would 'wake up the next day, and feel okay after some stretching exercises'; symptoms would spontaneously taper off and resolve 'over the following day or two.' ... From a functional standpoint, L.R. reports that 'My lifestyle was unaffected by my back...' and that he was able to perform urological procedures in the O.R. by avoiding heavy lifting, taking stretch breaks, and repositioning himself frequently.... While I do not believe that he is able to continue a physically demanding Urology practice as the only such specialist (covering the call-schedule single-handedly) on Kauai, he should have been (and continues to be) able to return to some type of modified or light duty, even if only on a part time basis....

It is not medically necessary for Mr. Raithaus to be completely off work....

Whether he will ever have complete resolution of his condition or impairment is unlikely, although he should be able to return to some type of gainful employment as a Physician....

Based on my evaluation, I recommend that Mr. Raithaus avoid activities that require him to stand in a fixed or awkward position, heavy lifting >15–20 lbs, or repetitive bending/lifting/twisting at the waist.

(U/A 1004–1016).

Dr. Cupo stated:

While completing further treatment, the employee may return to work in a limited-duty capacity with the following restrictions: no sitting or standing greater than 30 minutes consecutively without allowing a five-minute positional break; no squatting; no bending greater than four times per hour; no lifting greater than 10 lbs. These limitations are consistent with what the employee stated he could do and demonstrated during examination without significantly worsening his low back pain. I anticipate that the injury of 8/31/00 will turn out to be a temporary aggravation of the employee's preexisting low back condition.

(U/A 797–99).

most to the day with his termination from KMC for performance-related problems.

Defendant also makes a somewhat questionable argument that Plaintiff is not totally disabled under the Plan because he is certified and therefore can work in family practice and according to the "salary.com" website, family practice physicians' income can approximate 80% of Plaintiff's previous income.

Thus, there is factual support in the administrative record for each party's claims regarding Plaintiff's physical limitations and whether Plaintiff can earn 80% of his previous income. Therefore, there is a genuine issue of material fact as to whether Plaintiff is disabled under the Plan.

### Conclusion on Motions for Summary Judgment

The Court finds as a matter of law that Plaintiff's "regular occupation" under the Plan is "urologist" and that surgery is a "material and substantial duty" of Plaintiff's "regular occupation" as a urologist. To that extent, Plaintiff's motion for summary judgment is granted and Defendant's motion for summary judgment is denied.

The Court finds that, at a minimum, there is a genuine dispute as to whether Plaintiff is "disabled" under the Plan because there is conflicting probative evidence regarding Plaintiff's physical limitations and whether he can earn 80% of his previous income. Thus, except as to Plaintiff's "regular occupation" and whether surgery is a "material and substantial duty" of Plaintiff's "regular occupation" as a urologist, both parties' motions for summary judgment must be denied.

The trier of fact will have to determine the unresolved factual issues in this case, including the credibility of all involved. Although the Plaintiff has requested a jury trial, the Ninth Circuit has held that ERISA claims for benefits must be resolved in a bench trial on the administrative record. *See Kearney*, 175 F.3d at 1094–95; *Thomas v. Oregon Fruit Products Co.*, 228 F.3d 991, 996 (9th Cir.2000)("Thomas' claim that she entitled to a jury trial is directly at odds with our en banc determination that the appropriate manner to evaluate ERISA benefits claims is not only a bench trial, but a *specialized* form of bench trial")(referencing *Kearney*, supra)(emphasis in the original).[23] In such a trial, the Court may admit additional evidence from outside the administrative record if necessary for adequate *de novo* review. *See Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Employees*, 244 F.3d 1109, 1115 (9th Cir.2001).

### CONCLUSION

■ Plaintiff has presented material, probative evidence that Defendant's conflict of interest affected its decision to deny Plaintiff's benefits. Defendant has not rebutted this presumption. Therefore, the standard of review of the denial of Plaintiff's claim for benefits is *de novo*.

■ Plaintiff's Motion to Strike the surveillance video from the administrative record is DENIED.

Plaintiff's alternative motion to supplement the administrative record with the declaration of Dr. Hager is GRANTED to allow a "full and fair review."
Plaintiff's request for sanctions against Defendant is DENIED.

■ Plaintiff's "regular occupation" under the Plan is, as a matter of law, "urologist" and surgery is a "material and substantial duty" of Plaintiff's "regular occupation." To that extent, Plaintiff's motion for summary judgment is

**23.** Trial is scheduled to begin on September 14, 2004.

GRANTED and Defendant's motion for summary judgment is DENIED.

There is a genuine issue of material fact as to whether Plaintiff is "disabled" under the Plan. Thus Defendant's motion for summary judgment is DENIED and Plaintiff's motion for summary judgment is DENIED, except with respect to Plaintiff's "regular occupation" and whether surgery is a "material and substantial duty" of Plaintiff's "regular occupation."

IT IS SO ORDERED.